1   PATRICIA K. GILLETTE (STATE BAR NO. 74461)
    pgillette@orrick.com
2   ANDREW R. LIVINGSTON (STATE BAR NO. 148646)
    alivingston@orrick.com
3   AMIRA B. DAY (STATE BAR NO. 239045)
    aday@orrick.com
4   LENA P. RYAN (STATE BAR NO. 258782)
    lenaryan@orrick.com
5   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
6   405 Howard Street
    San Francisco, CA  94105-2669
7   Telephone:   +1-415-773-5700
    Facsimile:   +1-415-773-5759
8
    Attorneys for Defendant
9   TYCO ELECTRONICS CORPORATION

10

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13

14   ANTHONY VILLA, as an individual and on        Case No. CV 10-00516 MHP
     behalf of all others similarly situated,
15                                                 **DECLARATION OF LENA P. RYAN**
                        Plaintiff,                 **IN SUPPORT OF DEFENDANT**
16                                                 **TYCO ELECTRONICS**
            v.                                     **CORPORATION'S MOTION FOR**
17                                                 **SUMMARY JUDGMENT OR, IN THE**
                                                   **ALTERNATIVE, PARTIAL**
     TYCO ELECTRONICS CORPORATION, a               **SUMMARY JUDGMENT**
18   corporation; TYCO INTERNATIONAL (US)
     INC., a corporation; and DOES 1 through 50
19   inclusive.
                                                   Judge: Hon. Marilyn Hall Patel
20                      Defendants.                 Date: November 1, 2010
                                                   Time: 2:00 p.m.
21                                                 Ctrm.: 15

22

23

24

25

26

27

28

1       I, Lena P. Ryan, declare and state as follows:

2     1.   I am a member in good standing of the Bar of the State of California.  I am an attorney at

3 the law firm of Orrick, Herrington & Sutcliffe LLP, attorneys of record for Defendant Tyco

4 Electronics Corporation in this matter.  The exhibits attached hereto are true and correct copies of

5 records that are maintained by my firm in the regular course of business.

6     2.   Attached hereto as **Exhibit A** are true and correct copies of pages from the transcript of

7 the deposition of Plaintiff Anthony Villa taken on June 17, 2010 in the above-captioned case.

8     3.   Attached hereto as **Exhibit B** is a true and correct copy of a page from Exhibit 4 to Mr.

9 Villa's deposition transcript (document bates stamped P0010), which was identified by Mr. Villa

10 at his deposition on June 17, 2010, at deposition transcript page 51, line 22 through page 54, line

11 25, inclusive.

12     4.   Attached hereto as **Exhibit C** is a true and correct copy of Exhibit 7 to Mr. Villa's

13 deposition transcript, which was identified by Mr. Villa at his deposition on June 17, 2010, at

14 deposition transcript page 131, line 19 through page 134, line 6, inclusive.

15     5.   Attached hereto as **Exhibit D** is a true and correct copy of Exhibit 19 to Mr. Villa's

16 deposition transcript, which was identified by Mr. Villa at his deposition on June 17, 2010, at

17 deposition transcript page 219 line 10 through page 221, line 16, inclusive.

18     6.   Attached hereto as **Exhibit E** is a true and correct copy of a Stipulation as to Facts entered

19 into by Plaintiff Anthony Villa and Defendant Tyco Electronics Corporation, by and through their

20 respective counsel, dated September 16, 2010.

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

RYAN DEC. IN SUPPORT OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT,
CASE NO. CV 10-00516 MHP

1    7.   Attached hereto as **Exhibit F** are true and correct copies of documents bates stamped

2    P0028-P0031, which were served on Defendant with Plaintiff's Supplemental Responses to Tyco

3    Electronics Corporation's Request for Production of Documents, Set One on September 1, 2010,

4    as well as the corresponding Proof of Service.

5          All of the facts set forth herein are based on my personal knowledge and/or my

6    examination of records that are kept by my firm in the regular course of business.  If called as a

7    witness, I could testify competently thereto.

8          I declare under penalty of perjury under the laws of the United States of America and the

9    State of California that the foregoing is true and correct.

10          Executed in San Francisco, California on September 17, 2010.

11

12

13                                          Lena P. Ryan

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RYAN DEC. IN SUPPORT OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT,
CASE No. CV 10-00516 MHP

# EXHIBIT A

# MILLER & COMPANY REPORTERS

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY VILLA, as an individual
and on behalf of all others
similarly situated,

        Plaintiff,

    v.                               No. CV 10-00516 MHP

TYCO ELECTRONICS CORPORATION, a
corporation; TYCO INTERNATIONAL
(US) INC., a corporation; and
DOES 1 through 50, inclusive,

        Defendants.
_____/

DEPOSITION OF:  <u>ANTHONY VILLA</u>

TAKEN ON:       June 17, 2010

**NO.**           **REPORTED BY:**

    12715                JULIE ALFORD
                         CSR No. 7694

Los Angeles                San Francisco

800.487.6278

1    Q.   Any other names that you've gone by?

2    A.   No.

3    Q.   What's your date of birth?

4    A.   9-24-72.

10:13:10    5    Q.   And where are you currently living?

6    A.   In Dos Palos.

7    Q.   Where is that?

8    A.   D-o-s, separate word P-a-l-o-s.

9    Q.   It's a 209 area code; right?

10:13:22    10    A.   Yes.

11    Q.   And so is that near Modesto somewhere?

12    A.   It's about an hour away.

13    Q.   Okay.  And what's your address?

14    A.   2114 Coughlin Court.  C-o-u-g-h-l-i-n.

10:13:36    15    Q.   What's your ZIP?

16    A.   93620.

17    Q.   And is that a home or an apartment?

18    A.   A home.

19    Q.   And do you live there with anyone else?

10:13:50    20    A.   Yes.

21    Q.   Who?

22    A.   My wife and my daughter.

23    Q.   What's your wife's name?

24    A.   Maria.

10:13:54    25    Q.   Same last name?

6

1       A.   Yes.

2       Q.   And how old is your daughter?

3       A.   Two years and two months.

4       Q.   That's exciting.

10:14:02   5       A.   Yeah.

6       Q.   Makes for a busy time.

7       A.   Yep.

8       Q.   How long have you lived at the Coughlin

9  Court address?

10:14:08   10       A.   Since November of '05.

11       Q.   And do you own that property?

12       A.   Yes.

13       Q.   During the time that you worked for Tyco

14  Electronics -- which I'm going to refer to as just

10:14:24   15  Tyco today, if that's okay, but you understand I'm

16  talking about Tyco Electronics?

17       A.   Okay.

18       Q.   I assume that you refer to them as Tyco as

19  well?

10:14:32   20       A.   Tyco Electronics.

21       Q.   You use the full name when you talk about

22  them?

23       A.   I refer to them as that, but yeah, I'll use

24  Tyco.

10:14:42   25       Q.   So I'll do my best to say "Tyco Electronics"

7

1   breaks or rest breaks or overtime or anything like

2   that?

3        A.   I have not.

4        Q.   So for all the various issues that are

10:34:22   5   raised in this lawsuit by you against Tyco

6   Electronics, you did not bring any of those issues to

7   the attention of Tyco Electronics during your

8   employment; is that right?

9        A.   Correct.

10:34:36  10        Q.   Have you ever been involved in a criminal

11   case?

12        A.   No.

13        Q.   Have you ever testified in a criminal case?

14        A.   I have not.

10:34:46  15        Q.   Have you ever testified in court in any

16   case?

17        A.   No.

18        Q.   Have you ever brought an administrative

19   claim against anyone for anything?  And that would

10:34:56  20   include unemployment, workers' comp, discrimination

21   with an administrative agency.

22        A.   No.

23        Q.   Have you ever been divorced?

24        A.   No.

10:35:08  25        Q.   I want to talk briefly about Tyco

25

1  Electronics, and then move on to some other issues,

2  and we'll come back to Tyco Electronics.

3       You said you were an electrician III when

4  you worked there; correct?

10:35:28  5       A.   Yes.

6       Q.   And that was your job tile for the entire

7  time; correct?

8       A.   Yes.

9       Q.   And you were a nonexempt worker the entire

10:35:36  10  time at Tyco Electronics?

11       A.   Yes.

12       Q.   And you were on a standard probationary

13  period when you started at Tyco Electronics; correct?

14       A.   I don't recall.

10:35:46  15       Q.   Did anyone ever tell you at Tyco Electronics

16  that you were on a probationary period for the first

17  90 days of employment?

18       A.   Not that I remember.

19       Q.   You did receive a copy of the employee

10:35:58  20  handbook at Tyco Electronics; right?

21       A.   I don't recall if I actually took one home,

22  but I remember going through it with the HR person.

23       Q.   Do you recall seeing a probationary policy

24  in that handbook when you went through it with HR?

10:36:22  25       A.   I don't recall.

26

1        Q.    Do you recall being given the opportunity to

2    take the handbook home?

3        A.    I don't recall.

4        Q.    During your about nine weeks, I think, at

5    Tyco Electronics, who was your supervisor?

6        A.    Ken.

7        Q.    Do you remember Ken's last name?

8        A.    Harris.

9        Q.    Did you have a manager who was above Ken

10   Harris?

11       A.    Yes.

12       Q.    Who was that?

13       A.    Armando Ablaza.

14       Q.    Can you spell his last name for the court

15   reporter?

16       A.    I can try my best.  I believe it was

17   A-b-l-a-z-a.

18       Q.    Was there anyone else that you reported to

19   when you worked at Tyco Electronics other than Ken

20   and Armando?

21       A.    Reported to?

22       Q.    Maybe that's not a great question.

23             Was there anyone else who was responsible,

24   to your understanding, for supervising your work

25   other than Ken and Armando?

10:36:46

10:37:00

10:37:06

10:37:22

10:37:40

27

1       A.   No.

2       Q.   I understand that you worked with a number

3    of other electricians in doing the jobs that you were

4    assigned during your time at Tyco Electronics;

10:37:52   5    correct?

6       A.   Correct.

7       Q.   In fact, during the time that you worked at

8    Tyco Electronics, you were in a training period; is

9    that right?

10:38:00  10       A.   Correct.

11       MS. WESTMORELAND:  Object to the term

12    "training period."  It's vague and ambiguous.

13    BY MR. LIVINGSTON:

14       Q.   Well, you were working on the day shift so

10:38:08  15    that you could be trained in how things worked at

16    Tyco Electronics, what the machines were that

17    required fixing and what the processes were and

18    procedures were at Tyco Electronics; correct?

19       MS. WESTMORELAND:  Objection.  Calls for

10:38:22  20    speculation regarding the purpose of his employment.

21    BY MR. LIVINGSTON:

22       Q.   You can answer.

23       A.   Correct.

24       Q.   By the time your employment ended on

10:38:34  25    December 23rd, you had not gotten past that training

28

1    period; isn't that right?

2         A.    Correct.

3         Q.    So during the training period at Tyco

4    Electronics, you were paired with another electrician

10:38:52  5    with more seniority and more experience at Tyco

6    Electronics than you; correct?

7         A.    Yes.

8         Q.    So for any of the jobs that you did at Tyco

9    Electronics, there was always another electrician who

10:39:04  10   was working with you during that time period?

11        A.    Yes.

12        Q.    And which facility did you work at at Tyco

13   Electronics?

14        A.    Extruder division.

10:39:20  15        Q.    Okay.  Well, let me go more global.

16              What city did you work in?

17        A.    Menlo Park.

18        Q.    And do you know what department you were in

19   when you were an employee there?

10:39:34  20        A.    That would be the manufacturing department.

21        Q.    And you worked on extruders primarily?

22        A.    No.

23        Q.    So -- I'm sorry.  You made reference to the

24   extruder division.

10:39:46  25        A.    That's what they manufactured there.  They

                                                          29

1  manufactured shrink tubing.

2      Q.   Have you ever heard that Tyco Electronics is

3  broken down into various business units?

4      A.   Yes.

10:40:06  5      Q.   And do you know which business unit your

6  employment was with?

7      A.   I believe it was the electronics division.

8      Q.   And do you know if that was referred to as

9  CIS?  Does that ring a bell?

10:40:30  10     A.   I don't recall.

11     Q.   Okay.  Have you ever heard of something

12  called the CIS Business Unit, also referred to as the

13  Communications and Industrial Solutions Business

14  Unit?

10:40:42  15     A.   I don't recall.

16     Q.   How about something called the GIC?  Have

17  you ever heard of that?

18     A.   That sounds familiar.

19     Q.   Okay.  Well, in any event, did you work for

10:41:04  20  the plant maintenance group when you were an

21  electrician?

22     A.   Yes.

23     Q.   Okay.  And do you have a general

24  understanding of what the job was of the plant

10:41:20  25  maintenance group in Menlo Park?

30

1        A.   Yes.

2        Q.   And what is that understanding?

3        A.   To perform preventative maintenance and to

4    fix any equipment that broke down.

10:41:36  5        Q.   And for which facilities did they do this?

6    There are a couple of plants in Menlo Park --

7    right? -- that they had responsibility for?

8        A.   Yes.   The only one that I was exposed to was

9    the extrusion department.

10:41:56  10        Q.   And that was the site of your employment?

11        A.   Yes.

12        Q.   Do you remember the address of the building

13    or the --

14        A.   I do not.

10:42:04  15        Q.   Do you remember the building number?

16        A.   I believe it was A, B, and C.

17        Q.   And these buildings were all in the same

18    campus; correct?

19        A.   Correct.

10:42:22  20        Q.   So they were within a couple-minute walking

21    distance of each other?

22        A.   They're all connected, and it's divided by

23    sheetrock basically.

24        Q.   Okay.   So it's all one big facility;

10:42:38  25    correct?

31

1        A.    Yes.

2        Q.    Now, Tyco Electronics had some other

3   facilities in the Bay Area.  Did you know that?

4        A.    Yes.

10:42:48   5        Q.    Did you ever have to go work at any facility

6   away from your home-base facility?

7        A.    No.

8        Q.    Did any of your work at Tyco Electronics

9   take you away from that home-base facility?

10:43:02   10        A.    Yes.

11        Q.    What work was that?

12        A.    I'm sorry.  It was not work.

13        Q.    Oh.  Okay.  So just so we're clear, none of

14   your work for Tyco Electronics took you away from

10:43:16   15   your home base; correct?

16        A.    Correct.

17        Q.    Was there something related to your work at

18   Tyco that did take you away from home base?

19        A.    Yes.

10:43:24   20        Q.    What was that?

21        A.    To get tested for my baseline.  Check my

22   radiation in my blood.

23        Q.    Okay.  So I've been using home-base

24   facility, which is something I made up just now.  Is

10:43:42   25   there a better way to express the location where you

32

1  worked?

2      A.   No.  I understand you.

3      Q.   Okay.  So I'm going to call it the Menlo

4  facility.  You'll understand what I'm talking about?

10:43:52  5      A.   Okay.

6      Q.   So this baseline test, when was that?  Do

7  you know?

8      A.   I don't recall.

9      Q.   Was it at the beginning of your employment?

10:44:02  10      A.   It was towards the end.

11      Q.   Okay.  And do you recall why it was that you

12  were sent to get a baseline test for radiation

13  exposure?

14      A.   The piece of equipment that I worked on or

10:44:20  15  performed preventative maintenance on.

16           MR. LIVINGSTON:  Your answer tailed off, and

17  I missed the end of it.

18           Could you read that back?

19           (The record was read.)

10:44:32  20  BY MR. LIVINGSTON:

21      Q.   So there was something about that piece of

22  equipment that potentially exposed you to radiation?

23      A.   Yes.

24      Q.   And someone told you at Tyco Electronics

10:44:42  25  that you needed to get a baseline test to have

33

1   something to measure future tests against?

2       A.   Yes.   I had brought it up a couple of times

3   because I was already exposed to it numerous times,

4   and so I was a little worried myself.

10:45:04   5       Q.   What was the machine?

6       A.   I don't remember the exact name, but it shot

7   a beam of radiation to the tubing that allowed it to

8   have its memory of how big the tubing was in

9   diameter.

10:45:26   10       Q.   Sounds pretty cool.

11       A.   Yeah.

12       Q.   So where was this test given to you?

13       A.   I don't recall.   It was near Stanford

14   Clinic.

10:45:54   15       Q.   And you went there and you got your

16   baseline; is that right?

17       A.   Yes.

18       Q.   Do you know whether any other electricians

19   at Tyco Electronics had had the same type of baseline

10:46:06   20   test?

21       A.   Yes, I do.

22       Q.   Do you know who?

23       A.   I don't know exactly, but they had little

24   patches on their badges that would let anybody else

10:46:20   25   know that they had gotten their baseline.

34

1    Q.   Did you bring back or in some way deliver to

2  Tyco Electronics the results of your baseline test?

3    A.   I did not.

4    Q.   Do you know whether the lab sent them

10:46:44  5  directly to Tyco Electronics?

6    A.   I don't know.  I have not even seen them.

7    Q.   Who identified this specific lab as the

8  place to go to get your baseline test?

9    A.   Ken Harris.

10:47:00 10    Q.   Did you ever get a job description for your

11  work as an electrician III at Tyco Electronics?

12    A.   Did I ever --

13    Q.   Get a job description, a written document

14  that set forth your job?

10:47:30 15    A.   I believe so.

16    Q.   Did you keep a copy of that after you left

17  Tyco Electronics?

18    A.   I believe it was in the offer letter that I

19  do have.

10:47:50 20    Q.   So we do have some documents you produced.

21  You gave us a relatively small number of pages of

22  documents related to your employment at Tyco

23  Electronics, and I'll show you those in a little bit.

24        But do you think you have at your home or in

10:48:06 25  your car or at your current work any other documents

35

11:05:30
11:05:42
11:05:54
11:06:06
11:06:22

to Tyco Electronics, you believe that you provided us with all the documents in this request?

A. Yes.

Q. I would like you to go back, as I said, and look for those letters, and I'd like you to look for any cell phone records that reflect the time period that you worked at Tyco Electronics. I think both of those were called for by this request.

A. Yes.

Q. Will you do that?

A. Yes.

MR. LIVINGSTON: Okay. And, Counsel, just so we're clear, if we get to the end of the day and I don't have any more questions, I'm going to reserve now the right to come back and ask additional questions if additional documents are produced.

MS. WESTMORELAND: That's fine.

BY MR. LIVINGSTON:

Q. Now, your lawyer has prepared responses to Exhibit 3. Did you ever look at those responses?

A. Responses?

MR. LIVINGSTON: Well, let me show them to you.

I'll mark as Exhibit 4 your responses to Exhibit 3.

1          (Whereupon, the document referred to was

2          marked Defendant's Exhibit 4 for

3          identification by the Reporter, a copy of

4          which is bound separately.)

11:06:50   5          THE WITNESS:  Yes, I received this.

6     BY MR. LIVINGSTON:

7          Q.  Do you recall whether you received this

8     before or after it was sent to us?

9          MS. WESTMORELAND:  Calls for speculation.

11:07:04   10    It assumes facts not in evidence.

11    BY MR. LIVINGSTON:

12         Q.  Okay.  It was dated May 14th and signed by

13    your attorney on that date.

14         Do you recall whether you saw this before

11:07:14   15    that date?

16         A.  I don't recall.

17         Q.  Do you recall whether you saw it after that

18    date?

19         A.  Yes.

11:07:20   20    Q.  You did see it after that date?

21         A.  I did see --

22         MS. WESTMORELAND:  Well, he's seeing it

23    right now.

24         THE WITNESS:  Yeah.

11:07:28   25    ///

52

BY MR. LIVINGSTON:

    Q.   Other than today.

    A.   I don't recall the exact date.

    Q.   Okay.  Did you have any changes to the
document that your attorney showed you?

    A.   No.

    Q.   So at the end of this, beginning with a blue
sheet of paper, are documents that you produced in
response to our request, and they have numbers and
handwriting down at the bottom, P0001 through P0010.
That means there are ten pages that were produced.

    Are these the documents that you were able
to locate at your home in response to the request for
production that we gave you?

    A.   Yes.

    Q.   Did you give your attorneys any documents
other than these ten pages which we have here?

    A.   No.

    Q.   The first one is an offer letter that is not
signed.  This was something that you found on your
computer; correct?

    A.   Correct.

    Q.   Did you ever see a signed copy of the offer
letter?

    A.   I have not.

53

1      Q.   Did you ever sign the offer letter?

2      A.   Yes.

3      Q.   And did you give the signed copy of it to

4    Tyco Electronics?

11:08:48   5      A.   Yes.

6           (An off-the-record discussion was held

7           between Mr. Livingston and Ms. Zonetti.)

8    BY MR. LIVINGSTON:

9      Q.   And we also have here copies of pay stubs,

11:09:26   10   it looks like, that you received as an employee of

11   Tyco Electronics.

12          Are these -- were these in hard copy that

13   you had, or were these on your computer as well?

14     A.   Some of these were hard copies.

11:09:46   15     Q.   Were any of them on your computer?

16     A.   Yes.

17     Q.   Were you able to receive electronic wage

18   statements from Tyco Electronics?

19     A.   Yes.  These are my pay stubs that I received

11:10:16   20   electronically from HR, some of them.

21     Q.   Beginning with what page numbers?

22     A.   Beginning with page 4, page 6, and page 8.

23     Q.   So pages 5, 7, and 9 and 10 are all hard

24   copies; right?

11:10:58   25     A.   Yes.

                                                    54

1      Q.   Let me have you turn to the last page,

2  page 10.   This is a pay stub reflecting payment made

3  by Tyco Electronics to you for January of 2009.

4           Do you see that?

11:11:20  5      A.   Yes.

6      Q.   And the gross pay was $204.38.   Do you see

7  that?

8      A.   Yeah.

9      Q.   Do you have any understanding of what that

11:11:30 10  payment was for?

11      A.   I do not.

12      Q.   Did you ever contact anyone at Tyco

13  Electronics and ask them why you received this

14  paycheck?

11:11:46 15      A.   No.

16      Q.   Prior to this paycheck, had you already

17  received all of the wages that were owed to you

18  through 12/23/2008?

19           MS. WESTMORELAND:   Objection.   Calls for a

11:11:58 20  legal conclusion.

21  BY MR. LIVINGSTON:

22      Q.   Well, let me ask it a different way.   And I

23  know there are disputes over what you should be paid

24  and not paid.   That's why we're here.

11:12:06 25           But prior to this time, had you received

                                                        55

1  what you considered to be the final paycheck from

2  Tyco Electronics?

3       A.   At that time I don't really -- didn't

4  understand what this was.  I don't know if this was

11:12:26  5  the actual paycheck that I received or it was in

6  question in my mind.  But I remember receiving a

7  check after I was terminated, approximately two weeks

8  after I was terminated.  And then even after that, I

9  received a last check.  Didn't know what that was,

11:12:50  10  and I didn't know what to think.

11       Q.   Okay.  So the last check you received is the

12  one at P0010; right?  Or at least this was the pay

13  stub that went with it?

14            MS. WESTMORELAND:  Objection to the term

11:13:06  15  "last."  Vague and ambiguous.

16  BY MR. LIVINGSTON:

17       Q.   Okay.  Did you receive a check after the one

18  that accompanied the pay stub at P0010?

19       A.   I believe so.  The last check I received

11:13:24  20  didn't have any information on it.

21       Q.   Okay.  So you -- looking at P0010, you

22  believe that there was a check that came after the

23  check that is referenced here; is that right?

24       A.   I believe so.

11:13:40  25       Q.   Okay.  I can tell you the company has no

56

1    record of any payment made to you after the one

2    reflected at P0010.

3           Do you have any information about how much

4    that check was that came after this?

11:13:54   5    A.   I do not.

6    Q.   Do you have any recollection at all as to

7    when it came to you?

8    A.   I estimate a couple of months.

9    Q.   A couple months what?

11:14:12  10    A.   After my termination.

11    Q.   Okay.  Dollar amount you don't recall?

12    A.   I don't recall.

13    Q.   Do you recall what you did with the check?

14    A.   Yes.

11:14:24  15    Q.   Which is what?  Cashed it?

16    A.   I cashed it.

17    Q.   Do you recall anything on the pay stub that

18    identified anything about the check or why it was

19    being sent to you?

11:14:36  20    A.   No.

21    Q.   You didn't keep a copy of the pay stub for

22    this check we're talking about, did you?

23    A.   I did not find that pay stub.

24    Q.   Where did you keep the pay stubs that are

11:14:52  25    reflected in P0010 and P0008?

57

1    connected with any of the hours that you worked or

2    vacation that you earned or personal days that you

3    earned during your employment with Tyco Electronics?

4         A.   Correct.

11:23:02    5         MR. LIVINGSTON:   Let's take a quick break.

6         (A brief recess was taken.)

7    BY MR. LIVINGSTON:

8         Q.   Sir, I'd like you to take a look at

9    Exhibit 4 and go backwards to a different page.   Hang

11:36:44   10    on.   Actually, hang on one second.   I apologize.

11         Okay.   So to page 5, which again is a hard

12    copy of a pay stub you received from Tyco

13    Electronics; right?

14         A.   Yes.

11:37:26   15         Q.   And just very quickly, the employer listed

16    here is Tyco Electronics Corp. US.

17         Do you see that?

18         A.   Yes.

19         Q.   And there's an employee number.   That's your

11:37:36   20    number?

21         A.   Correct.

22         Q.   83370?

23         A.   Correct.

24         Q.   And then there's a building number, R16.

11:37:44   25         Was that the number of a building where you

64

1   worked?

2       A.   That doesn't ring a bell.

3       Q.   Okay.   There's a cost center number, 14239.

4            Do you know what that is?

11:37:58   5       A.   I don't.

6       Q.   Then there's a payroll area, and it says

7   "B3."

8            Do you know what that is?

9       A.   No.

11:38:04   10       Q.   There's an hourly rate for $22.   Was that

11   your hourly rate at Tyco Electronics?

12       A.   Yes.

13       Q.   And that was the same rate throughout your

14   entire time?

11:38:16   15       A.   Correct.

16       Q.   So this reflects a check that you received

17   sometime after your employment ended with Tyco

18   Electronics; right?   Or do you remember when you

19   received the check that came along with this pay

11:38:32   20   stub?   Let me ask it that way.

21       A.   I don't recall.

22       Q.   Do you recall receiving a FedEx package from

23   Tyco Electronics that included two checks?

24       A.   I don't recall if it was two checks, and I

11:38:52   25   don't recall the carrier, but I remember receiving a

65

1   check approximately -- I don't know -- a week and a

2   half to two weeks after I was terminated.

3        Q.   And you don't recall a check coming to you,

4   actually being delivered to you on December 23rd,

11:39:12   5   2008?

6        A.   No.

7        Q.   So I want you to look at P7, which is

8   another pay stub.  And this pay stub also reflects a

9   payment made to you.  And my understanding was that

11:39:48  10   the checks and the pay stubs reflected on page 5 and

11   page 7 both came to you in the same envelope.

12        Do you have a recollection of that?

13        A.   I do not.

14        Q.   Do you recall the date that you received the

11:40:00  15   check reflected on P5?

16        A.   I do not.

17        Q.   Do you recall the date that you received the

18   check reflected on P7?

19        A.   I do not.

11:40:18  20   Q.   Do you recall whether the P7 check came

21   before the P5 check or vice versa?

22        A.   I have no idea.

23        Q.   And your best estimate is that you received

24   a check from Tyco about a week and a half after your

11:40:34  25   employment ended?

66

1      A.    Yes.  A week and a half, two weeks.

2      Q.    Do you have the envelope that the check or

3  checks came in?

4      A.    No.

11:41:00  5      Q.    And just so I'm totally clear, you don't

6  remember if they came separately or together; right?

7      A.    Correct.

8      Q.    What was the last day you actually performed

9  any services at Tyco Electronics?

11:41:14 10      A.    I believe it was the 23rd.

11      Q.    Do you remember coming in on the morning of

12  the 22nd, a Monday, and being told that you wouldn't

13  be working there anymore?

14      A.    I thought it was the 23rd.

11:41:28 15      Q.    What makes you think it was the 23rd?

16      A.    Because it was -- that's the day I got

17  terminated, and it was close to Christmas is how I

18  remember.

19      Q.    So do you remember coming in after a weekend

11:41:42 20  and not being able to find your tools and going to

21  Ken and asking him where your tools were?

22      A.    Yes.

23      Q.    Do you remember that was --

24      A.    I don't --

11:41:50 25      Q.    -- immediately following a weekend?

67

1    A.    I don't remember that.

2    Q.    And the day that you inquired about your

3 tools and where they were, you were informed that you

4 were terminated; right?

11:42:22 5    A.    Not at that time.

6    Q.    You were pulled up into an office with

7 Armando and Ken; correct?

8    A.    Correct.   When I was asking for my tools,

9 that's when Ken told me somebody must have been

11:42:36 10 playing a game with me.

11    Q.    Okay.   And Armando told you something

12 different up in his office?

13    A.    Until Armando came, that's when Ken pulled

14 me in his office.   That's when we started our little

11:42:46 15 meeting.

16    Q.    And you were terminated during that meeting;

17 right?

18    A.    Yes.

19    Q.    So you were sent home, and you didn't

11:42:52 20 perform any other work?

21    A.    Correct.

22    Q.    And we talked about them being your tools,

23 but these were Tyco Electronics' own tools; correct?

24    A.    Not all of them.

11:43:00 25    Q.    Okay.   Were there any tools that were yours

68

1    that you were using at Tyco Electronics?

2         A.    Yes.

3         Q.    What tools?

4         A.    My multimeter, and I had some Klein

11:43:14  5    screwdrivers.

6         Q.    Did you get those back?

7         A.    All except the multimeter.

8         Q.    When did you get the Klein screwdrivers

9    back?

11:43:28 10         A.    That same day.

11         Q.    Did you ask for the multimeter?

12         A.    After I remembered, on the way home I called

13    Ken and left a message on his cell phone.

14         Q.    Did he respond?

11:43:44 15         A.    No.

16         Q.    What is a multimeter?

17         A.    It's a piece of equipment that measures

18    voltage and amps and resistance.

19         Q.    Is it small, about the size of a pack of

11:44:06 20    cards?

21         A.    Bigger than that.  I'd say it's about double

22    in size.  About seven inches by four.

23         Q.    And what does a multimeter cost?

24         A.    Depends on the series you have.  I believe

11:44:26 25    the series I had was a 179 series Fluke, and I

                                                    69

1   believe it was approximately $400.

2       Q.   Did Tyco Electronics have its own

3   multimeters?

4       A.   I don't recall.  I know they had volt

11:44:48   5   meters, but I'm not sure if they had the multimeters.

6       Q.   Why did you bring your own multimeter into

7   work?

8       A.   That was something that I needed to perform

9   my work, and I was used to using that type of

11:45:04   10  multimeter.

11      Q.   Were there any other pieces of equipment

12  that Tyco Electronics had that would serve the same

13  purpose as a multimeter?

14      A.   Not that I know.

11:45:18   15  Q.   Did you ask anybody?

16      A.   We went into a place called "Stores," and

17  they provided me with a voltage tester and any other

18  tools that I needed, except for that multimeter.

19      Q.   To your knowledge, did any other

11:45:42   20  electricians have multimeters that they used?

21      A.   Yes.

22      Q.   Any other pieces of equipment not returned

23  to you or just the multimeter?

24      A.   Just the multimeter.

11:46:04   25  Q.   Was yours marked in any way that identified

70

1 Electronics, did you go to any sort of classes where

2 you received certificates or anything like that?

3     A.   Yes.

4     Q.   What did you go to?

12:17:18 5     A.   I attended Heald College and took some

6 electronics courses.  And then I attended Monterey

7 Peninsula College and received a certificate of

8 completion for the fire academy.

9     Q.   And those were all before Tyco Electronics?

12:17:44 10     A.   Yes.

11     Q.   Anything else?  Any other, you know, outside

12 education like that as opposed to education provided

13 on the job by an employer or in a classroom at the

14 employer's location?

12:17:58 15     A.   It was PLC programming, the prerequisite for

16 the programing class at Hartnell College in Salinas.

17     Q.   Hartnell?

18     A.   Yes.

19     Q.   Anything else prior to Tyco Electronics?

12:18:18 20     A.   It was the reserve peace officer standards

21 and training, I received a certificate for that.

22 That's all.

23     Q.   That's it?

24     A.   That's all I can remember.

12:18:38 25     Q.   And during the period that you worked at

94

1    Tyco Electronics, did you take any courses or

2    training at any sort of outside organization?

3         A.   No.

4         Q.   So any training you received during the time

12:18:50   5    that you worked at Tyco Electronics was on-the-job

6    training?

7         A.   Yes.

8         Q.   There was a point in time at Tyco

9    Electronics where you had asked to attend some

12:19:10   10   specific type of outside training; right?  Do you

11   remember that?

12        A.   That was after I had asked my manager about

13   courses that would help me at that company.

14        Q.   And that was Armando that you asked?

12:19:36   15   A.   Yes.

16        Q.   And he told you that he wasn't going to send

17   you to any courses at that time; correct?

18        A.   Correct.

19        Q.   And he did not in fact send you out to any

12:19:48   20   courses at that time; right?

21        A.   Correct.

22             MR. LIVINGSTON:  I'm going to mark as the

23   next exhibit in line, which I think is No. 5, an

24   employment application for you.

12:20:26   25        (Whereupon, the document referred to was

95

1    A.   Yeah, Canadian.   French Canadian.

2    Q.   I asked you this morning about your cell

3  phone carrier while you worked at Tyco Electronics.

4         Do you have a more clear recollection now?

13:23:44  5    A.   I do not.

6    Q.   Was it the same cell phone carrier that your

7  wife had?

8    A.   I don't recall.

9    Q.   How did you find out about the job opening

13:24:16  10  at Tyco Electronics?   Was it through the recruiter

11  that you mentioned?

12    A.   Yes.

13    Q.   And your understanding was they were looking

14  for an electrician?

13:24:26  15    A.   Correct.

16    Q.   At the Menlo Park facility?

17    A.   Yes.

18    Q.   How far was the Menlo Park facility from the

19  medical office that you went to for your radiation

13:24:38  20  baseline test?   Do you know?   Menlo Park borders Palo

21  Alto.

22    A.   Yes.   East Palo Alto, yes.   I would say an

23  estimate of six miles.

24    Q.   And did you go to that location of the lab

13:24:58  25  during business hours?

102

1      A.   Yes.

2      Q.   During working hours?

3      A.   Yes.

4      Q.   So you were on the clock?

13:25:04  5      A.   Yes.

6      Q.   And you were paid for that time?

7      A.   Yes.

8      Q.   And did you drive your own vehicle?

9      A.   No.

13:25:14  10     Q.   What did you drive?

11     A.   Ken Harris drove me in the company truck.

12     Q.   I'm sorry.  Company truck?

13     A.   Yes.

14     Q.   And as far as you know, you were paid for

13:25:38  15   that time?

16     A.   As far as I know, correct.

17     Q.   Have you ever received Express Mail or

18   overnight mail or FedEx-type packages at your house?

19     A.   Besides the check?

13:25:56  20     Q.   Yes.

21     A.   With other --

22     Q.   From anyone.

23     A.   Yes.

24     Q.   Do you know where they're left when a

13:26:06  25   carrier delivers an overnight package to you?

103

1  about this company.

2      Q.   So you had been laid off from which company?

3      A.   Modutek.

4      Q.   Do you know why you were selected for

13:29:18  5  layoff?

6      A.   From what they told me was, there was a

7  downturn in sales.

8      Q.   And you were an electrician at Modutek?

9      A.   Yes.

13:29:34  10     Q.   How long had you been an electrician as of

11  the time that you joined Tyco Electronics?

12     A.   Let me see.

13     Q.   And I'm just looking for an estimate.  I

14  don't need you to bring out a calculator and work out

13:29:50  15  the fine details.

16     A.   Approximately five years.

17     Q.   When you joined Tyco Electronics, you joined

18  at least a group of electricians who were working in

19  the plant maintenance group; right?

13:30:08  20     A.   Yes.

21     Q.   Do you know how many electricians were in

22  that group?

23     A.   Seven I'd say, approximately.

24          MS. WESTMORELAND:  Now, do you mean for his

13:30:22  25  shift or for the entire --

106

BY MR. LIVINGSTON:

Q.   That was actually my follow-up.   So seven represents the day shift?

A.   One shift.   The shift I was on.

Q.   And you were working exclusively on the day shift?

A.   Yes.

Q.   And at some point after training, the plan was for you to go either to the swing shift or the night shift; right?

A.   Correct.

Q.   What were the hours that the day shift worked?

A.   6:00 to 2:30.

Q.   What were the hours for the swing shift?

A.   I don't know.

Q.   And how about for the night shift or graveyard shift?

A.   I don't know.

Q.   And employees working on the swing shift and on the night shift receive some sort of shift differential; right?

A.   From what I was told, correct.

Q.   Did employees working on the day shift get a shift differential?

107

1        A.    No.

2        Q.    And you were told that once you finished

3    training and worked on the night shift that you would

4    get a shift differential; right?

5        A.    Yes.

6        Q.    And you never completed training; correct?

7        A.    Correct.

8        Q.    And you never were assigned to work on

9    either the swing or the night shift; correct?

10       A.    Correct.

11       Q.    So under the conversations you had when you

12   were hired on, you never had the right to get a shift

13   differential; correct?

14            MS. WESTMORELAND:  Objection.  Calls for a

15   legal conclusion.

16            You can answer.

17            THE WITNESS:  Yes, I did not receive a

18   differential.

19   BY MR. LIVINGSTON:

20       Q.    And you weren't entitled to receive one;

21   correct?

22            MS. WESTMORELAND:  Same objection.

23            THE WITNESS:  Correct.

24   BY MR. LIVINGSTON:

25       Q.    Did you negotiate your hourly rate when you

108

13:31:30
13:31:44
13:31:58
13:32:04
13:32:16

1   joined?

2       A.   No.

3       Q.   They told you they'd pay you 22 bucks, and

4   that was it?

13:32:24  5       A.   Yes.

6       Q.   Did you ask for more?

7       A.   No.

8       Q.   When you joined the day shift, it sounds

9   like there were approximately seven electricians who

13:32:40 10   were working on that shift; right?

11       A.   Correct.

12       Q.   Does the seven include you?

13       A.   Yes.

14       Q.   Do you know how many electricians at that

13:32:48 15   time worked on the swing shift?

16       A.   Approximately four.

17       Q.   And how about the night shift?

18       A.   I don't know.

19       Q.   Fewer than four?

13:33:06 20       A.   I have no clue.

21       Q.   You interviewed for the job with Ken Harris,

22   Albert Howell, Armando Ablaza and -- at least those

23   three?

24       A.   Eric -- Armando Ablaza came afterwards.  But

13:33:32 25   yes.

109

1      A.   No.

2      Q.   In light of your experience at that prior

3 employer, at Mission CC, did you think to ask any

4 questions about meal and rest breaks at Tyco

13:36:08  5 Electronics during the interview process?

6      A.   No.

7      Q.   Was there any discussion during the

8 interview process regarding how you would be paid for

9 overtime?

13:36:26  10     A.   Yes.

11     Q.   And do you recall that?

12     A.   Time and a half for any hours worked over

13 eight.

14     Q.   Did you learn during the interview process

13:36:36  15 that you would get double time if you worked at some

16 level in a given day?

17     A.   That they didn't explain, that I can recall.

18     Q.   Did you ever learn that the policy at Tyco

19 Electronics was that between 8 and 12 hours you would

13:36:54  20 receive time and a half and above 12 hours you get

21 double time?

22     A.   I learned that training with Albert, yes.

23     Q.   Can you give me a general summary of what

24 the job duties are of an electrician in the plant

13:37:24  25 management group at Tyco Electronics, at least as you

112

1    regular eight-hour workday.

2        Q.   Okay.  So to the extent that there was work

3    beyond the regular workday, it would be the

4    troubleshooting repair-type work; correct?

13:40:04  5        A.   Or training.

6        Q.   Or training?

7        A.   Yes.

8        Q.   So why would there be training beyond a

9    regular workday?

13:40:10  10        A.   I don't know.

11        Q.   So tell me how that would work.  You were

12    pretty much assigned to work with different

13    electricians during the period that you worked at

14    Tyco Electronics; right?

13:40:22  15        A.   Correct.

16        Q.   So because they would have to work beyond a

17    regular workday and you were training with them, you

18    would stay and work beyond the regular workday?

19        A.   Yes.

13:40:32  20        Q.   Okay.  You wouldn't have occasion, though,

21    to work longer than the person with whom you were

22    training on a particular project on a particular day;

23    correct?

24        A.   Correct.

13:40:50  25        Q.   Did your group of electricians on the day

115

1  shift have any set schedule as to when rest breaks

2  were taken?

3      A.   Yes.

4      Q.   What was the schedule?

13:41:02  5      A.   The schedule was -- I believe it was

6  nine o'clock is our break for ten minutes, and then

7  our lunch was scheduled at 11:50 to 12:30.

8      Q.   Okay.  So you said from 9:00 A.M. to

9  9:10 A.M.  And that was paid time; correct?

13:41:30  10      A.   Correct.

11      Q.   And were you aware that there were times

12  when your break was actually longer than from

13  9:00 A.M. to 9:10?

14      A.   Was I aware of it?

13:41:42  15      Q.   Yeah.  I mean -- okay.  That's a lawyer

16  question.  I'm sorry.  Let me rephrase it.

17          Were there occasions when your break was

18  longer than ten minutes, the morning break?

19      A.   I don't recall, but -- I don't recall.

13:41:56  20      Q.   As a general matter, was it true that all

21  the electricians would break at the same time?

22      A.   Yes.

23      Q.   So if the person that you were working with

24  on training took a break, you would take a break as

13:42:08  25  well?

116

1          A.    Yes.

2          Q.    And there have -- my understanding -- I'll

3     put it that way -- was that breaks were actually

4     15 minutes in length in the morning, from 9:00 to

5     9:15.

6          Do you recall taking breaks that were

7     15 minutes in duration?

8          A.    I don't recall that.

9          Q.    Do you believe that may have happened?  You

10    just don't remember it?  Or do you believe that never

11    happened?

12         A.    I just don't recall either way.

13         Q.    And when you would take a break with the

14    other electricians, would you join them at one of the

15    picnic tables outside, or would you do something

16    different on that rest break in the morning?

17         A.    The rest break, it would be sometimes at the

18    picnic table, sometimes in our area, the maintenance

19    area.

20         Q.    So the maintenance group had a room where

21    you would meet at the beginning of a shift; correct?

22         A.    Correct.

23         Q.    And that's where your computer was; right?

24         A.    Yes.

25         Q.    So you could take your break in either

117

1    Q.   Were there any occasions when you did not

2  take a rest break in the morning, a ten-minute rest

3  break?

4    A.   I don't recall.

13:44:42  5    Q.   You don't recall any?

6    A.   Yes, correct.

7    Q.   And how would the break end?  Would there be

8  some sort of whistle blown or an announcement, or

9  would it monitored by the person you were training

13:44:54  10  with?

11    A.   It would be monitored by myself or people in

12  the maintenance area.

13    Q.   So after about ten minutes, you would get up

14  and go back to your assignment?

13:45:04  15    A.   Yes.

16    Q.   Do you know whether these breaks in the

17  morning were recorded in any way?

18    A.   I don't know.

19    Q.   So you said that there was a meal break that

13:45:28  20  started at 11:50; correct?

21    A.   Correct.

22    Q.   And 11:50, not 11:45?

23    A.   No.  11:50.

24    Q.   And how would you know to take a meal break

13:45:42  25  starting at 11:50?

119

1    A.    That's -- anybody who we would be working

2    with in the maintenance team would say "Time for

3    lunch."

4    Q.    So did electricians take a break in the same

13:45:56  5    schedule as mechanics?

6    A.    Yes.

7    Q.    Did you ever become aware that mechanics

8    would be staggered in their breaks so that they were

9    not taking them at exactly the same time as

13:46:08  10    electricians?

11    A.    No.    We worked on -- when we worked -- when

12    we performed preventative maintenance on a machine,

13    there would have to be a mechanical team there and an

14    electrical team there.

13:46:28  15    Q.    And those breaks would last until 12:30; is

16    that correct?

17    A.    Correct.

18    Q.    So those breaks were 40-minute breaks;

19    right?

13:46:40  20    A.    Yes.

21    Q.    And were you paid for any of that 40-minute

22    time period?

23    A.    Just the ten minutes to complete the

24    eight-hour work shift.    Everything was paid except

13:46:58  25    the lunch break.

120

1    Q.   Okay.  So to your understanding, the way it

2  worked was that out of the 40 minutes that you had

3  from 12:00 -- I'm sorry -- from 11:50 to 12:30, you

4  were paid for ten minutes of that but not for the

13:47:14   5  other 30; correct?

6    A.   Correct.

7    Q.   So from 11:50 to 12:20 would be the unpaid

8  30 minutes, and then from 12:20 to 12:30 would be the

9  paid ten minutes; correct?

13:47:28  10         MS. WESTMORELAND:  Calls for speculation.

11  BY MR. LIVINGSTON:

12    Q.   If you know.  If you don't, that's fine.  I

13  don't want you to speculate.

14    A.   Okay.  I don't know.

13:47:34  15    Q.   So you don't know which portion you were

16  actually paid for or not?

17    A.   Correct.

18    Q.   Other than you were paid ten minutes out of

19  that 40 minutes?

13:47:42  20    A.   Yes.

21    Q.   Did you understand that the ten minutes of

22  payment was payment for an afternoon rest break?

23    A.   Yes.

24    Q.   And did you have an understanding at any

13:47:56  25  time as to why a meal break was combined with a

                                                           121

1    ten-minute paid rest break?

2         A.   No.

3         Q.   Did you ask anybody?

4         A.   No.

13:48:06  5         Q.   Did you ask anybody whether you could take

6    your rest break at some later time after a 30-minute

7    unpaid meal break?

8         A.   No.

9         Q.   Do you know whether any electricians were

13:48:20  10   able to or did, in fact, take their rest break

11   separate from their meal break?

12        A.   I was aware that they did not.

13        Q.   So to your knowledge, every electrician took

14   a meal break followed by a ten-minute rest break?

13:48:34  15        A.   Yes.

16        Q.   And to your knowledge, did mechanics work on

17   the same schedule where they took a 30-minute meal

18   break, and then they took a ten-minute paid rest

19   break?

13:48:48  20        A.   Or vice versa, yes.

21        Q.   You say vice versa because you don't know

22   which came first?

23        A.   Correct.

24        Q.   How many mechanics were on the day shift?

13:49:02  25   Do you have an estimate?

                                                          122

1          A.   I would say the same amount as my estimate.

2   Seven.

3          Q.   And how about the swing shift?   Roughly four

4   mechanics?

13:49:24  5          A.   I would -- I don't know.

6          Q.   And night shift, do you know?

7          A.   I do not.

8          Q.   Do you know any other groups of employees at

9   Tyco Electronics at the Menlo Park facility that

13:49:38  10  would combine their meal break with their rest break?

11         A.   I do not.

12         Q.   Do you know of any other groups of employees

13  at any Tyco Electronics facility in California that

14  combine their meal and rest breaks?   And of course

13:49:54  15  I'm talking about nonexempt employees.

16         A.   I do not.

17         Q.   So your knowledge is only as to what the

18  mechanics and electricians did in plant maintenance

19  at the Menlo Park facility on the day shift; right?

13:50:12  20         A.   Correct.

21         Q.   And you don't know what the schedule was

22  that worked for meal and rest breaks on either the

23  swing shift or the night shift; correct?

24         A.   Correct.

13:50:28  25         Q.   Had anyone ever told you that the

123

1      A.   I did not.

2      Q.   And the difference between combining breaks

3   at Tyco Electronics and at Mission CC was that you

4   didn't get paid for the ten-minute break at Mission

13:53:16   5   CC; is that right?  That's at least one difference.

6      A.   As far as I know, we did get paid for the

7   ten-minute break at Mission CC.

8      Q.   Oh.  Okay.  Did you record in any way the

9   time that you took your lunch break?

13:53:34   10      A.   No.

11      Q.   Do you know whether you had the ability to

12   record the time that you began and ended your lunch

13   break?

14      A.   No.

13:53:44   15      Q.   Do you know why you were not recording the

16   beginning and end of your lunch break?

17      A.   I do not.

18      Q.   Do you know whether Tyco Electronics has a

19   policy for all its nonexempt employees in California

13:53:58   20   regarding the recording of the start and end of a

21   lunch break?

22      A.   I do not.

23      Q.   Are you familiar with the lunch and rest

24   break practices at any Tyco Electronics facility in

13:54:18   25   California other than the maintenance and electronics

126

1    group on the day shift where you worked?

2         A.    I was not.

3         Q.    When you started employment at Tyco

4    Electronics, you received certain personnel-type

13:54:56    5    documents; right?

6         A.    Correct.

7         Q.    One such document was an offer letter; is

8    that right?

9         A.    Yes.

13:55:08    10         MR. LIVINGSTON:    I'll mark as Exhibit 6 the

11    offer letter, which also was attached to the end of

12    Exhibit 4, but I want that to be a separate exhibit.

13              (Whereupon, the document referred to was

14              marked Defendant's Exhibit 6 for

13:55:32    15              identification by the Reporter, a copy of

16              which is bound separately.)

17    BY MR. LIVINGSTON:

18         Q.    So we talked about this document before.

19    It's in fact the same exact one that you provided

13:55:46    20    to -- I'm sorry -- the same exact one that's attached

21    to Exhibit 4.

22              This is the electronic version of the offer

23    letter you received from Tyco Electronics; right?

24         A.    Yes.

13:55:56    25         Q.    And as I recall it, you believe that you

127

1   executed a copy of this by signing on the line that

2   says "Accepted" on page 2?

3        A.   Correct.

4        Q.   And as you look at this document now, is

13:56:18   5   there any reason to believe that this is not an exact

6   copy of the document that you signed?

7        A.   No reason.

8        Q.   So to the best of your knowledge, this is a

9   true and correct copy of your offer letter at Tyco

13:56:34  10   Electronics; right?

11        A.   Yes.

12        Q.   So going through the first couple of lines,

13   you were being offered a position as an electrician

14   at Tyco Electronics in Menlo Park; right?

13:56:50  15        A.   Correct.

16        Q.   And you were going to be classified as an

17   nonexempt employee; correct?

18        A.   Yes.

19        Q.   And you were going to be reporting to

13:56:58  20   Armando Ablaza; right?

21        A.   Correct.

22        Q.   And all of those things turned out to be

23   accurate; correct?

24        A.   Correct.

13:57:02  25        Q.   It says here "start date will be Monday,

128

1   October 20th."

2   Does that refresh your recollection as to

3   when you started?

4   A.   Yes.

13:57:08   5   Q.   So you believe you started work on

6   October 20th, 2008?

7   A.   Correct.

8   Q.   It says it's contingent upon you passing a

9   background check and a pre-employment drug screening,

13:57:24   10   but you did pass both of those; right?

11   A.   Yes.

12   Q.   It references an annual salary, which is

13   $45,760.

14   Do you see that?

13:57:36   15   A.   Yes.

16   Q.   And that's essentially 20 hours -- I'm

17   sorry -- $22 an hour for 40 hours a week; right?

18   A.   Correct.

19   Q.   And then it says that you are going to

13:57:50   20   receive a shift differential percentage upon

21   completion of your training; right?  That's next to

22   Annual Salary.

23   A.   Correct.

24   Q.   So your understanding was that when you

13:58:12   25   finished your training and then worked on one of the

129

1   annually that accrued per pay period at the rate of

2   3.8 hours; is that right?

3       A.   Correct.

4           MS. WESTMORELAND:   I'm going to -- belated

13:59:40  5   objection.   It calls for a legal conclusion.

6   BY MR. LIVINGSTON:

7       Q.   Okay.  Well, you can still answer.  I don't

8   believe that is a well-founded objection, but that's

9   fine.

13:59:50  10          And then it provided that you would receive

11  personal days and sick days accrued at 1.54 hours per

12  pay period.

13          Do you see that?

14      A.   Yes, I do.

14:00:02  15      Q.   And do you have any reason to believe that

16  you did not accrue these types of benefits on the

17  schedule set forth in this letter?

18      A.   I have not a clue if I received it or not.

19          MR. LIVINGSTON:   We mentioned earlier an

14:00:24  20  employee handbook.  I'm going to mark it as

21  Exhibit 7.

22          (Whereupon, the document referred to was

23          marked Defendant's Exhibit 7 for

24          identification by the Reporter, a copy of

14:00:40  25          which is bound separately.)

131

|       |                                                            |
|-------|------------------------------------------------------------|
| 1     | MR. LIVINGSTON:  And it's a lengthy                        |
| 2     | document.  I'm not going to ask you to read                |
| 3     | everything right now.  But I do want to mark one more      |
| 4     | exhibit in connection with it, and it's Exhibit 8, an      |
| 5     | employee hire form.                                        |

14:00:54 (line 5)

|       |                                                            |
|-------|------------------------------------------------------------|
| 6     | (Whereupon, the document referred to was                   |
| 7     | marked Defendant's Exhibit 8 for                           |
| 8     | identification by the Reporter, a copy of                  |
| 9     | which is bound separately.)                                |

14:01:10 (line 10)

10  BY MR. LIVINGSTON:

11      Q.   So let's look at --

12           MS. WESTMORELAND:  Sorry.

13           Madam Court Reporter, if you could redact

14  the Social Security number off of Exhibit 8, I would

14:01:18 (line 15)

15  appreciate that as well.  Thank you.

16  BY MR. LIVINGSTON:

17      Q.   So Exhibit 8 is something called "Employee

18  Hire Form" for Tyco Electronics, and there's a stamp

19  up there saying it was October 22nd, 2008.

14:01:32 (line 20)

20           Do you see that?

21      A.   Yes.

22      Q.   So on the bottom third of the document,

23  there's a place that says "Employee Signature," and

24  then there is a signature.

14:01:42 (line 25)

25           Is that your signature?

132

1       A.    It looks like it.

2       Q.    Do you have any reason to believe it is not

3   your signature?

4       A.    No.

14:01:50  5       Q.    And it shows up underneath a statement that

6   says, "I acknowledge that I have received a copy of

7   the Tyco Electronics Employee Handbook."  And then it

8   continues to say something else about questions.

9             Do you see that?

14:02:04  10      A.    Yes.

11      Q.    So looking at that document -- I'm sorry.

12  When you signed that, you intended to be -- you know,

13  accurately confirming the statement just above it;

14  correct?

14:02:16  15      A.    Correct.

16      Q.    You wouldn't sign something that you believe

17  to be inaccurate; correct?

18      A.    Yes.

19      Q.    So when you signed that, you were

14:02:22  20  acknowledging that you had in fact been provided with

21  a copy of the employee handbook; correct?

22      A.    Correct.

23      Q.    So Exhibit 7 is that employee handbook; is

24  that right?

14:02:36  25      A.    I believe so.

133

1     Q.    You have no reason to believe it's not the

2    handbook you received when you joined Tyco

3    Electronics; right?

4     A.    Correct.  I just haven't noticed things like

14:02:48  5    the April 2002 on the bottom.  I noticed that when I

6    first looked through the handbook.

7     Q.    Do you recall whether you read this handbook

8    after you were given a copy of it?

9     A.    I don't recall.  I went over this with --

14:03:06  10    very briefly with the HR rep.

11     Q.    Do you remember the rep's name?

12     A.    Christina.

13     Q.    And she sat you down as some sort of HR

14    orientation program; is that right?

14:03:20  15     A.    Yes.

16     Q.    And she went through various paperwork for

17    Tyco Electronics?

18     A.    Correct.

19     Q.    And one thing she did was walk through this

14:03:28  20    employee handbook; right?

21     A.    Yeah, just touched on certain paragraphs,

22    and it wasn't a page by page thing.  It was examples

23    of what's in here, and that was it.  Take it home,

24    read it.

14:03:48  25     Q.    So you understood that it was expected as an

134

1        Q.   Was your personal cell phone used by you for

2   any work-related activities?

3        A.   I don't recall.

4        Q.   Well, you had your work phone --

14:07:50  5        A.   I don't think so.

6        Q.   And you had your work phone for that?

7        A.   Correct.

8        Q.   You said uniforms.  Were you required as an

9   electrician to wear a uniform?

14:08:00 10        A.   Yes.

11        Q.   Are you aware of any electricians who did

12   not wear uniforms?

13        A.   No.

14        Q.   Did you ever see a guy who refused to wear a

14:08:14 15   uniform but wore a Hawaiian shirt instead?

16        A.   No.

17        Q.   You didn't know him?

18        A.   (No audible response.)

19        Q.    What are you talking about uniforms?  What

14:08:22 20   do they look like?

21        A.   Basically I think -- I don't know what

22   material it was.  Pants, shirt, shoes, safety

23   glasses, and depending on what we were working on

24   that day, it would be safety gloves.

14:08:50 25        Q.   All of those items were provided to you by

139

1    Tyco Electronics?

2         A.   Yes.

3         Q.   So I've never actually seen one of these

4    uniforms.   What color are they?

14:09:00  5         A.   Blue.

6         Q.   So all the electricians wore the same

7    uniform?

8         A.   Yes.

9         Q.   And they're identical blue pants?

14:09:04 10         A.   Yes.

11         Q.   And with an identical blue shirt?

12         A.   Yes.

13         Q.   They weren't jumpsuits or something like

14    that?

14:09:16 15         A.   No.

16         Q.   Did they have your name or the Tyco name or

17    something on them to indicate who you were?

18         A.   Both my name and the Tyco name.

19         Q.   So were all these uniforms waiting for you

14:09:32 20    when you joined Tyco on October 20th, or was it

21    something that took a while for you to get?

22         A.   I don't recall that.

23         Q.   So when you showed up on October 20th, do

24    you remember if they had a uniform waiting for you?

14:09:58 25         A.   I don't think so.

140

1    Q.   Do you recall that they actually had to take

2 your measurements and then place an order with the

3 uniform company for your uniforms?

4    A.   Yes.

14:10:08    5    Q.   And do you recall that when your uniforms

6 finally came, they were, as you described, I guess --

7 they had your name on them and the Tyco Electronics

8 name?

9    A.   Yes.

14:10:16  10    Q.   Do they have some sort of number, too, an

11 employee number?

12    A.   No.

13    Q.   Actually, I've never seen these uniforms.  I

14 should probably take a look some day.

14:10:30  15         The -- I assume that you got more than one

16 uniform; right?

17    A.   Correct.

18    Q.   How many did they give you when you joined?

19    A.   I don't know.

14:10:42  20    Q.   Do you recall it being around ten uniforms

21 that electricians would receive?

22    A.   Around ten.  I --

23    Q.   Maybe more actually?

24    A.   Yeah, I think they provided enough for two

14:10:56  25 weeks.

141

1     Q.   So that would be at least ten --

2     A.   Yes.

3     Q.   -- of two five-day weeks?

4     A.   Correct.

14:11:02   5     Q.   And the uniforms, you were able at the end

6   of a shift to put them in a laundry pile or

7   something?

8     A.   Yes.

9     Q.   So you weren't required to launder or press

14:11:14  10   your uniforms?

11     A.   Take them home with us?

12     Q.   Yes.

13     A.   We were not allowed to.

14     Q.   To take home dirty uniforms?

14:11:22  15     A.   Correct.

16     Q.   You could take home the clean uniforms;

17   right?

18     A.   I don't know.

19     Q.   Are you aware of employees who took home

14:11:30  20   their clean uniforms?

21     A.   No.

22     Q.   And then dressed at home and came into work

23   fully dressed?

24     A.   No.

14:11:36  25     Q.   Did you ever see Ken when he came into work?

142

1   guys?

2       A.   Dave -- what was his last name?

3       Q.   Strachan?

4       A.   That doesn't ring a bell.

14:12:38  5   Q.   Bill Talakai?

6       A.   Bill sounds -- there was a Bill.   Mechanic?

7       Q.   Do you know if he came in with his uniform?

8       A.   If that's the right Bill that I'm talking

9   about, he changed there.

14:12:54  10      Q.   Francisco, did he come in with his uniform

11  on?

12      A.   No.

13      Q.   So you saw all these individuals change in

14  the locker room; is that right?

14:13:08  15      A.   Correct.

16      Q.   But it's possible that for each of the ones

17  I've named that on some occasions that you didn't

18  observe they came in wearing their uniforms; right?

19      A.   It's possible on a couple of those people

14:13:24  20  that you mentioned, they have their -- some of their

21  uniforms where they work, on the computer, by the

22  computer, the cubicle, and then some of them are in

23  the locker rooms.

24      Q.   So was there any part of the uniform that

14:13:42  25  you were required to pay for yourself?

144

1      A.   No.

2      Q.   So the uniforms and all the pieces that we

3  talked about were purchased for you by Tyco

4  Electronics; correct?

14:13:52   5      A.   Correct.

6      Q.   And any laundering or maintenance of the

7  uniforms was also paid for by Tyco Electronics?

8      A.   Correct.  The boots, now, the shoes, we were

9  given a voucher of $100.  We would have to pay the

14:14:08  10  difference.

11      Q.   Well, there were shoes -- there were boots

12  available from the vendor for the exact price of the

13  voucher; correct?

14      A.   If you could find shoes that cheap, yes.

14:14:18  15      Q.   And the employees had the option of buying

16  nicer boots if they wanted, but they would have to

17  cover the cost of the nicer boots?

18      A.   Correct.  I've never seen anything that are

19  electrical rated that are under $100.

14:14:32  20      Q.   Do you remember the voucher being a little

21  bit more than 100 bucks?

22      A.   I don't remember.

23      Q.   Do you remember it being 150 bucks?

24      A.   I thought it was $100.

14:14:42  25      Q.   Can you buy electrical-rated boots for 150

145

1  bucks?

2      A.   Yes.

3      Q.   And do you know from which vendor you

4  purchased your boots?

14:14:48  5      A.   Becks.

6      Q.   Becks?   That's B-e-c-k-s?

7      A.   Yes.

8      Q.   And you used a voucher to purchase your

9  boots; correct?

14:14:58  10      A.   Correct.

11      Q.   Did you pay anything above and beyond the

12  value of the voucher?

13      A.   Yes.

14      Q.   How much?

14:15:04  15      A.   Offhand I would say about 26.

16      Q.   Do you have any receipts for that?

17      A.   I do not.

18          MS. WESTMORELAND:   Andrew, whenever it's a

19  good time to take a break, if we could do so I'd

14:15:22  20  appreciate it.

21          MR. LIVINGSTON:   Let me do one thing first.

22          I'm going to mark as the next exhibit in

23  line, which is Exhibit 9, a FedEx tracking slip.

24          (Whereupon, the document referred to was

14:15:50  25          marked Defendant's Exhibit 9 for

146

BY MR. LIVINGSTON:

    Q.   We're back on after a short break.

        You didn't look at any documents over the break, did you?

14:33:52    A.   No.

    Q.   Okay.  I have been told that I had a number wrong; so let me reask this question.

        Do you actually recall that the amount of the voucher was $120?

14:34:04    A.   I don't recall.

    Q.   So is it fair to say you don't recall the specific dollar amount of the voucher?

    A.   It's fair to say.  My belief is $100.

    Q.   Okay.  Do you recall having a discussion

14:34:18  with Ken at the very beginning of your employment that if you chose boots that were not covered by the voucher that you could submit the difference for reimbursement?

    A.   I don't recall that.

14:34:32    Q.   Did you ever submit the difference for reimbursement?

    A.   No.

    Q.   Do you know whether other employees at Tyco Electronics have submitted the difference between the

14:34:44  voucher and the actual price of the boots for

152

1  reimbursement?

2      A.   I'm not aware of that.

3      Q.   The boots that you purchased, do you recall

4  what the brand is?

14:34:52  5      A.   I don't recall.

6      Q.   Do you recall what the model number is or

7  the model name?

8      A.   No.

9      Q.   Do you still have them?

14:35:02  10      A.   No.

11      Q.   You were able to keep them after your

12  employment ended; correct?

13      A.   Correct.

14      Q.   And did you continue to wear them?

14:35:10  15      A.   No.

16      Q.   Did you get rid of them at some point?

17      A.   Yes.

18      Q.   Why?

19      A.   Because they were no good for me.

14:35:20  20      Q.   They were nine weeks old.  Why were they no

21  good?

22      A.   I just never used them after that.

23      Q.   You didn't need them in the current

24  employment that you have at a company that's not to

14:35:30  25  be named?

153

1      A.    They provided me with shoes.

2      Q.    And the next company who sold you the shoes,

3  did they have some sort of store location, or was it

4  the on-site truck that you purchased them from?

14:35:48  5      A.    The on-site truck.

6      Q.    Do you have any record anywhere of the

7  purchase transaction?

8      A.    No.

9      Q.    The balance that you say you paid, did you

14:36:00  10  use a credit card for it?

11      A.    I believe I did.  I -- I -- that's just from

12  what I recall.

13      Q.    And what credit card did you use?

14      A.    Not a credit card.  Just my bank card.

14:36:20  15      Q.    So a debit card?

16      A.    Debit card, correct.

17      Q.    So which bank account do you believe you

18  used?

19      A.    I believe it was the BofA.

14:36:44  20      Q.    When you first started working with Tyco

21  Electronics, did Ken take you to the location where

22  Tyco Electronics kept its tools for electricians?

23      A.    Yes.

24      Q.    And you were allowed to select the tools

14:36:58  25  that you needed to use?

154

1       A.   He selected them for me.

2       Q.   Okay.  And do you recall him selecting a

3   multimeter for you?

4       A.   I don't recall that.

14:37:08  5       Q.   Do you recall there being multimeters from

6   which to select?

7       A.   I don't recall other than the voltage

8   testers.

9       Q.   Do you know that other -- do you know

14:37:20  10   whether or not other electricians were offered a

11   multimeter by Tyco Electronics?

12       A.   I don't know that.

13       Q.   Ken recalls that you selected a multimeter

14   from that collection, and you selected the 179 series

14:37:36  15   fluke, whatever that is.  It's the same thing you

16   said.

17            It doesn't help refresh your recollection

18   that Tyco Electronics provided you with a multimeter?

19       A.   I don't recall it.

14:37:46  20       Q.   After you were notified of your termination,

21   Ken gave you the opportunity to go through your tool

22   kit and to take any tools that were your personal

23   property; is that right?

24       A.   That's correct.

14:37:58  25       Q.   And you did take away certain tools at that

155

1    time; correct?

2         A.    Correct.

3         Q.    Why did you not take away the multimeter

4    that you say you brought to Tyco Electronics?

14:38:08  5         A.    Because I stored that in the cabinet drawer.

6         Q.    I'm sorry?

7         A.    I would store that in the cabinet drawer.

8         Q.    What cabinet drawer?

9         A.    Where all the maintenance group, people,

14:38:18  10   hung out or would work.

11        Q.    And why did you not -- at the time that Ken

12   gave you the ability to pick out and take your tools,

13   why did you not get the multimeter at that time?

14        A.    I completely forgot about it.  It was out of

14:38:34  15   my sight.

16        Q.    Did you purchase this multimeter just for

17   your work at Tyco Electronics or did you have it

18   already?

19        A.    I had it already.

14:38:42  20        Q.    How long had you had it at the point that

21   you brought it to Tyco Electronics?

22        A.    Wow.  I'd say about four years.

23        Q.    Had you marked it in any way to indicate

24   that it was yours?

14:39:02  25        A.    No.  That was something I could recognize

156

1  because of certain scratches or certain stains on it.

2  I could tell it would be mine.  That's how I would

3  recognize my own multimeter.

4        Q.   So to assist us in locating that tool now,

14:39:18  5  can you give us any distinguishing marks or

6  scratches?  No tattoos of course, but --

7        A.   Just a bunch of scratches, oil stains,

8  nothing that would -- it's kind of like if you

9  work -- as an electrician, you know your own tools.

14:39:42  10  You've worked with them.  It's something you're used

11  to.  It's an extension of your hands basically.  And

12  I can identify it myself if I were to see it.

13        Q.   What color was it?

14        A.   Yellow.

14:39:56  15        Q.   Any other colors on it?

16        A.   Gray.

17        Q.   Did it look different in color and outside

18  appearance from the other multimeters that

19  electricians used?

14:40:14  20            MS. WESTMORELAND:  Meaning electricians at

21  Tyco?

22            MR. LIVINGSTON:  Yes.  Thank you.

23            MS. WESTMORELAND:  Assumes facts not in

24  evidence.

14:40:22  25            Go ahead and answer, if you know.

157

1          THE WITNESS:  I didn't notice other than

2     that theirs might have been a different model.  I

3     didn't really notice.

4     BY MR. LIVINGSTON:

5          Q.   You say you left a voice mail message for

6     Ken about the multimeter?

7          A.   Yes.

8          Q.   And did you leave your cell phone number for

9     him?

10         A.   Yes.

11         Q.   Do you know whether your connection was

12    clear enough so that your entire cell phone number

13    was audible to Ken on the machine?

14         A.   I called him twice and left a message.

15         Q.   Did Ken give you the opportunity to look

16    through your desk as well and to clear out any items

17    of your personal property from there?

18         A.   He escorted me to my desk, and I also had a

19    box of my own personal tools and crimpers, and that's

20    where I sorted out the tools, put them in my box and

21    left.

22         Q.   Did Tyco Electronics have crimpers?

23         A.   Not that I'm aware of.

24         Q.   Aren't they sort of a basic tool for

25    electricians?

                                                       158

1       A.   They are.

2       Q.   And you don't believe that Tyco Electronics

3   provides that tool to its electricians?

4       A.   They -- I didn't -- or I should say Ken

14:42:06   5   didn't pick those out for me.

6       Q.   You knew that there was a location for

7   tools, though; correct?

8       A.   Correct.

9       Q.   And if you didn't have a tool that you

14:42:14   10   needed, you knew that you could go to that location

11   with Ken's assistance to see if they had a tool you

12   needed; right?

13       A.   Yes.

14       Q.   And did you ever go back to that location?

14:42:26   15       A.   For --

16       Q.   To find another tool?

17       A.   Yes.

18       Q.   Did you go back to find crimpers, for

19   instance?

14:42:34   20       A.   I did not.

21       Q.   So I want to -- and I don't want to keep

22   asking questions about this topic, but I really want

23   to understand this multimeter.

24            Do you remember Ken giving you the ability

14:42:52   25   to choose, not from an actual piece of equipment in

159

1  it for the beginning of your shift?

2        A.    I don't recall.

3        Q.    Okay.  So you don't recall one way or the

4  other whether you were given an instruction about

14:47:10  5  taking a fresh uniform home and changing into it at

6  home?

7        A.    That I don't recall.

8        Q.    We talked earlier about the meal break being

9  combined with a rest break for a total of 40 minutes

14:47:42  10  each day; correct?

11        A.    Correct.

12        Q.    Was there any time that you worked at Tyco

13  in the brief period of your employment where you did

14  not take that 40-minute break combined together?

14:47:54  15        A.    There was not.

16        Q.    We were talking at one time about Exhibit 7,

17  which is the handbook.  I'd like you to open that up

18  again, and I want to direct you to page 44 using our

19  number down at the bottom, DEF00044.  And

14:48:38  20  specifically I'd like you to look at Time

21  Records/Cards.

22              Do you see that section?

23        A.    Yes.

24        Q.    And here it sets forth a policy regarding

14:48:48  25  time records and cards.

163

1          Do you see that?

2     A.   Yes.

3     Q.   And do you understand that that's what this

4 is, en employee policy regarding time records and

14:48:56  5 cards?

6     A.   Yes.

7     Q.   And it says that employees are responsible

8 for the accuracy of their time records or timecards.

9          Do you see that?

14:49:02 10   A.   Yes.

11    Q.   And you understood as an employee that that

12 was your responsibility?

13    A.   Correct.

14    Q.   You also understood that you were

14:49:08 15 responsible for providing and submitting work time

16 according to the local practice in your business

17 unit?

18    A.   Correct.

19    Q.   And do you believe that you did that at all

14:49:18 20 times?

21    A.   Yes.

22    Q.   I'd like you to turn to another section.

23 Again, one second.

24          I'd like you to look at page 23.  And you

14:50:08 25 see the section called Introductory Period?

164

1    BY MR. LIVINGSTON:

2        Q.   Have you ever seen this one before?

3        A.   I have not.

4            MR. LIVINGSTON:  I'll mark as Exhibit 12 a

14:53:24  5   meal period policy.

6            (Whereupon, the document referred to was

7            marked Defendant's Exhibit 12 for

8            identification by the Reporter, a copy of

9            which is bound separately.)

14:53:34  10  BY MR. LIVINGSTON:

11        Q.   How about this one?

12        A.   No.

13        Q.   If you were going to seek reimbursement for

14   expenses you had to incur at Tyco Electronics, do you

14:54:22  15  know how that would have occurred, what the process

16   was?

17        A.   No, I do not.

18        Q.   Were there any expenses that you incurred as

19   an employee at Tyco Electronics that was not paid for

14:54:34  20  by Tyco Electronics?

21        A.   No.

22            MR. LIVINGSTON:  I'll mark as Exhibit 13 a

23   pay statement explanation.

24            (Whereupon, the document referred to was

14:54:54  25            marked Defendant's Exhibit 13 for

                                                    167

1  members?

2      A.   Eventually I'm sure I did, but not right

3  away.

4      Q.   Did anyone ever instruct you not to take

15:56:42 5  meal breaks or not to take rest breaks at Tyco

6  Electronics?

7      A.   Verbally, no.

8      Q.   Did they suggest it to you in some other

9  way?

15:57:02 10      A.   Yes.   Training.

11      Q.   And how did they suggest it to you in

12  training?

13      A.   Basically it was going over troubleshooting,

14  and it was past my lunchtime, and it continued on and

15:57:22 15  ended up delaying the -- my lunch break.

16      Q.   By how long?

17      A.   I would say about -- about 20 minutes.

18      Q.   And did you make it up at the back end?

19      A.   No.

15:57:48 20      Q.   Who was it --

21          MS. WESTMORELAND:   Do you know what he means

22  by that?

23          THE WITNESS:   I --

24          MS. WESTMORELAND:   I'll object as vague and

15:57:52 25  ambiguous.

206

BY MR. LIVINGSTON:

    Q.   Did -- I don't know if it's vague and
ambiguous, but -- so who --

        MS. WESTMORELAND:  If you can explain it to
him.

BY MR. LIVINGSTON:

    Q.   Who is it that did this?

    A.   Albert Howell.

    Q.   And do you remember what day?

    A.   Not exactly, no.

    Q.   And did you explain that it was time for you
to take your meal break?

    A.   Did he explain or did I?

    Q.   Did you?

    A.   No.

    Q.   And did you extend your meal break to make
up for the time that he started it late?

    A.   I believe so.  Get my full 30 minutes.

        MR. LIVINGSTON:  Why don't we take a short
break.  We're almost done.

        (A brief recess was taken.)

BY MR. LIVINGSTON:

    Q.   Back on the record.

        So I showed you earlier some examples of
your pay stubs.  They were a part of your document

207

1    production, which was Exhibit 4.

2         And were you the type of employee who would

3    look at the pay stub every time you received one to

4    determine if it was accurate?

16:16:46    5    A.    No.  I assumed it's accurate.

6         Q.    Do you recall any time raising an issue with

7    Tyco Electronics saying that the pay stub did not

8    actually reflect payment for all time that you worked

9    as an employee?

16:17:04    10    A.    No.

11         Q.    Are you aware of any time that you were not

12    paid for all the time that you worked as an employee?

13         A.    No.

14         Q.    How is it that you were able to find a new

16:17:30    15    job after Tyco Electronics so quickly?

16         A.    I must have been on the list of -- an

17    agency's list.  My résumé must have been registered

18    with them, and they called me and asked me if I

19    wanted a position or if I was interested in a

16:17:50    20    position.

21         Q.    Okay.  It wasn't through the unemployment

22    department and their efforts to find employees' jobs?

23         A.    No.

24         Q.    Did you ever file any sort of administrative

16:18:00    25    claim?  I know you can't remember whether you filed

208

1              MS. WESTMORELAND:  Can you repeat the

2    question for me, please?

3              (The record was read.)

4              MS. WESTMORELAND:  Thank you.

16:20:52  5              THE WITNESS:  No.

6    BY MR. LIVINGSTON:

7         Q.   Is there anything that you're aware of that

8    supports that the meeting took place on December 23rd

9    other than your memory as you've told us today?

16:21:02  10        A.   No.

11        Q.   Are you aware of any times when anyone at

12   Tyco Electronics went in and edited the time entries

13   for you in CRONOS?

14        A.   I was not aware, no.

16:21:30  15        Q.   So are you aware of any time that someone

16   went in and edited the time entries for you in CRONOS

17   to make it look like you worked less time than you

18   actually worked?

19        A.   I'm not aware of that.

16:21:50  20        Q.   Are you aware of any editing that was done

21   of your time records that actually denied you of pay

22   that you believe that you had earned?

23        A.   Can you repeat that?

24        Q.   Yeah.  Do you -- are you aware of any time

16:22:08  25   that your time records were edited to deny you pay

                                                         211

1    that you believe you had earned?

2              MS. WESTMORELAND:   At Tyco?

3    BY MR. LIVINGSTON:

4        Q.   At Tyco Electronics.   Nowhere else.

16:22:28   5        A.   Just going off these records, it does look

6    like there may have been some edits, but I'm not

7    quite sure they were made, but they may or may have

8    not included my pay.

9        Q.   So you don't know one way or the other?

16:22:44   10        A.   I don't.

11             MR. LIVINGSTON:   Okay.   So let me look

12   through a couple of documents, and in particular let

13   me -- the first one I want to do is show you your

14   supplemental disclosures.   I don't know if you've

16:23:06   15   seen these before.

16             So this will be the next exhibit in line.

17             (Whereupon, the document referred to was

18             marked Defendant's Exhibit 18 for

19             identification by the Reporter, a copy of

16:23:42   20             which is bound separately.)

21   BY MR. LIVINGSTON:

22       Q.   Okay.   So this is one of those documents

23   that gets produced in a lawsuit by your attorneys,

24   and in particular this document identifies people

16:23:58   25   that might become in some way a potential witness in

212

1          Q.    How about at the beginning?  Did staffing

2     change between --

3          A.    Yes.  It was -- we were told that they took

4     a hit in business; so -- and orders, and so they

16:30:32  5     actually laid some people off on the production

6     floor.

7          Q.    So how did that affect electricians and

8     their staffing level?

9          A.    From what I was told, because they were

16:30:50  10    downsizing.

11         Q.    Okay.  I'm a little confused, and maybe I

12    created the problem.

13              Was there ever a time on the day shift where

14    you did not have enough electricians during your

16:31:06  15    employment to get the work done that needed to get

16    done?

17         A.    Oh.  No.

18         Q.    Was there ever a time on the day shift that

19    you did not have enough electricians to permit you to

16:31:22  20    take -- to permit electricians to take meal and rest

21    breaks as scheduled?

22         A.    No.

23         Q.    Do you know whether you earned any floating

24    holiday pay at Tyco Electronics?

16:31:54  25              MS. WESTMORELAND:  Objection.  Legal

217

1    overtime worked?

2              MS. WESTMORELAND:  Legal conclusion.

3              THE WITNESS:  I am not aware.

4    BY MR. LIVINGSTON:

16:34:08   5       Q.   Just so I'm clear, you did not have access

6    to during your employment a Maximo report setting

7    forth all the projects that you worked on; is that

8    right?

9         A.   Not that I recall.

16:34:38   10             MR. LIVINGSTON:  I'm going to mark as the

11   next exhibit in line a separate exhibit, which would

12   be pay stubs produced by Tyco Electronics.

13             (Whereupon, the document referred to was

14             marked Defendant's Exhibit 19 for

16:34:48   15             identification by the Reporter, a copy of

16             which is bound separately.)

17   BY MR. LIVINGSTON:

18        Q.   So what I've marked as Exhibit 19 are pay

19   stubs for your employment with Tyco Electronics, and

16:35:16   20   they're, I think, identical to what we looked at

21   earlier but organized in a different way and in a

22   different format.

23             I'd like you to take a quick look at these

24   documents, and let me know whether you agree that

16:35:32   25   these are the pay stubs for your work at Tyco

219

1  Electronics.

2          MS. WESTMORELAND:  Andrew, these weren't

3  produced either.  I know they're marked.  Are they

4  Bates stamped?

16:35:56  5          MR. LIVINGSTON:  I believe they were

6  produced.  And so why don't you do this.

7          MS. WESTMORELAND:  I confirmed with my

8  office regarding the other ones, and they said that

9  the hard copies are missing those pages as well.  But

16:36:08  10  I'll send you guys a letter and identify our gaps in

11  the production.

12          MR. LIVINGSTON:  Yeah, and I'll check as

13  well to see whether these were produced.  But, you

14  know, they were our first eight documents.  There's

16:36:20  15  no reason --

16          MS. WESTMORELAND:  And what I have starts

17  on -- with the policy, but I'll send you a letter on

18  the gaps.

19          MR. LIVINGSTON:  Well, you have the gaps

16:36:30  20  now.  I mean, take a look at --

21          MS. WESTMORELAND:  No. 1.

22          MR. LIVINGSTON:  Right.  But take a look at

23  any other parts of the production to see if there's a

24  gap in what you have, if there's a number gap.  We've

16:36:42  25  identified perhaps two gaps, and now you have the

220

1   documents related to those gaps.

2          MS. WESTMORELAND:  Uh-huh.

3          MR. LIVINGSTON:  If there are any more,

4   we'll fill them in.  I don't understand why you

16:36:50   5   wouldn't have had these.  But in any event, this is

6   identical information to what we produced in other

7   formats, and you have those as well.

8      Q.  So, sir, these are your pay stubs; is that

9   right?

16:37:06   10      A.  They don't look like the same pay stubs that

11   I received and taken home, no, but they look like a

12   soft version of them.

13      Q.  Okay.  You have no reason to believe that

14   these are not accurate statements of your pay when

16:37:20   15   you worked at Tyco Electronics?

16      A.  No.

17          MR. LIVINGSTON:  I'm going to mark as the

18   next exhibit in line, No. 20, a different summary of

19   your time records.

16:38:30   20          (Whereupon, the document referred to was

21          marked Defendant's Exhibit 20 for

22          identification by the Reporter, a copy of

23          which is bound separately.)

24   BY MR. LIVINGSTON:

16:38:36   25      Q.  So what I provided you is essentially the

221

1

2

3          I, JULIE ALFORD, Certified Shorthand

4   Reporter, License No. 7694, do hereby certify:

5          That, prior to being examined, the witness

6   named in the foregoing deposition, to wit, ANTHONY

7   VILLA, was by me duly sworn to testify the truth, the

8   whole truth and nothing but the truth:

9          That said transcript was taken down by me in

10  shorthand at the time and place therein named and

11  thereafter reduced to computerized transcription

12  under my direction.

13

14          I further certify that I am not interested

15  in the event of the action.

16

17          WITNESS this 28th day of June, 2010.

18

19

20  _____

21          JULIE ALFORD

22

23

24

25

                                                    225

# EXHIBIT B

ANTHONY M VILLA                    Tyco Electronics Corp US  Employee Number:   83370
2114 COUGHLIN CT                                             Building: R16 Cost Center: 14239    Payroll Area: B3
DOB PALOS CA  93620                                          Hourly Rate/Periodic Sal: $    22.00
                                                            Hourly Rate/Lead Pay:              0.00
Pay Period : 01/05/2009 - 01/18/2009                        401k Deductions: Pre-Tax   0 % Post-Tax   0 %
Pay Date:     01/23/2009                                    Mar. Status Exemptions Additional Amt.
                                                            Federal    Married   03
                                                            State      Married   03

|         | Cash. Earn. | Taxes | Deds  | Net Pay |
|---------|-------------|-------|-------|---------|
| Current | 204.38      | 17.88 | -7.04 | 193.54  |
| YTD     | 204.38      | 17.88 | -7.04 |         |

| Cash Earnings          | Hours  | Current | YTD    |
|------------------------|--------|---------|--------|
| Regular Pay (Non-Ex) * | 16.00  | 352.00  | 352.00 |
| SICK Pay             * | -6.71  | 147.62  | 147.62 |

| Non-Cash Earnings   | Current | YTD |
|---------------------|---------|-----|
| 401k Company Match * | 17.60  |     |

| Voluntary Deducts. | Current | YTD   | Balance |
|--------------------|---------|-------|---------|
| 401k Pre-Tax       | -7.04   | -7.04 |         |

| Taxes       | Current | YTD   |
|-------------|---------|-------|
| Social Sec. | 12.67   | 12.67 |
| Medicare    | 2.96    | 2.96  |
| DI/UC       | 2.25    | 2.25  |

| Taxable Earns. | Current | YTD    |
|----------------|---------|--------|
| Federal        | 211.42  | 211.42 |
| Social Sec.    | 204.38  | 204.38 |
| Medicare       | 204.38  | 204.38 |
| California     | 211.42  | 211.42 |
| DI/UC          | 204.38  | 204.38 |

| Current Net Pay Distribution |   |        |
|------------------------------|---|--------|
| Check                        | $ | 193.54 |

|      | Used  | Cur. Bal | Prj. Bal |
|------|-------|----------|----------|
| VAC: |       | 37.00    | 154.00   |
| PER: |       | 7.80     | 7.80     |
| SCK: | 16.00 | 13.40    | 45.80    |

# EXHIBIT C





D's  EXHIBIT 7
Julie Alford
CSR No. 7694
Date: 6-19-10
Witness:
VILLA

April 2002

CONFIDENTIAL

DEF00009

# Table of Contents

## 1. INTRODUCTION 1

Welcome 1
A Message Concerning This
    Handbook 1
Human Resources Intranet Web Site 2
Commitment to Quality 3
Commitment to Diversity 3
Tyco Electronics in the Community 3

## 2. POLICY STATEMENTS 3

Equal Employment Opportunity and
    Affirmative Action Policy 3
Freedom from Harassment 3
Violence-Free Workplace 4
Drug- and Alcohol-Free Workplace 5
Employment Standards 5
Environment, Health, and Safety 7
Smoke-Free Environment 9

## 3. BENEFITS 9

Benefits—Health and Welfare Plans 9
Stock Purchase Plan 9
Retirement Investment and Savings
    Plan—401(k) 10
Worker's Compensation 10
Continuation of Benefits (COBRA) 10
Career Development 11
Employee Assistance Program
    (EAP) 12
Fitness and Recreation 12
Other Benefits 13

## 4. RECORD KEEPING AND
       EMPLOYEE DATA 13

Hire Date and Service Credit Data 13
Introductory Period 13
Classification Of Employees 14
Verification of Employment 14
Human Resources Records 14
Promotion, Job Assignment, and
    Transfer 16
Job Posting 16
Performance Management 16
Salary Management 17

## 5. GENERAL RULES AND
       PROCEDURES 17

Drugs and Alcohol 17
Sexual Harassment 19
Fitness for Duty 20
Searches 20
Employee Business Expenses 21
Conflict Of Interest 21
Confidential Company Information 23
Solicitation 23
Tyco Electronics Property 24
Electronic Information and
    Communication Systems 24
Security 26
Personal Telephone Calls 26
Parking 26
Dress Code 26
Recycling 27
Plant Closings: Inclement Weather,
    Emergency Situations, and
    Unscheduled Shutdowns and
    Delays 27
Communication 27
Disciplinary Guidelines 28
Complaint Resolution 29
Reduction in Force and Facility
    Closures 30
Resignation 30
Termination of Employment 31
Exit Interviews 31

## 6. PAY, WORK TIME,
       VACATION 31

Compensation 31
Hours Of Work and Work
    Schedules 32
Premium Pay 33
Rest and Meal Periods 33
Attendance and Absence 33
Three Days No Show or No Call 34
Assignment of Wages and Wage
    Garnishment 34
Leaves Of Absence 34
Time-Off Benefits 36

CONFIDENTIAL

# 1. Introduction

## Welcome

The purpose of this handbook is to provide employees with the basic guidelines used at Tyco Electronics. Tyco Electronics believes that these policies and practices represent a cross-section of the consideration and common sense needed to govern us as we work and earn a living.

Teamwork is a fundamental ingredient in the day-to-day success of Tyco Electronics. The level of commitment to teamwork that is sought can be achieved only through mutual respect and pride in our business.

You will notice regular references made to three ongoing goals for each employee and for the company as a whole. Striving for continual improvement in these areas is the key to our long-term success:

**SAFETY**—Our number-one priority. Any other gains and successes lose their value and appeal if a member of the team is injured on the job.

**QUALITY**—Our efforts to continually improve the quality of the products we build for our customers are rewarded by repeat business.

**PRODUCTIVITY**—Our search for ways to reduce the cost of our

products helps protect and preserve our position in the marketplace.

In addition, **CUSTOMERS,** both internal and external, must always be foremost in our minds. Tyco Electronics would not exist without satisfied customers.

Please become familiar with the contents of this handbook. Be sure to seek an explanation if there is any policy or practice that seems unclear. Your supervisor can help, and you may feel free to contact the Human Resources Department.

If all of us support our coworkers and remain mindful of our major goals, the company is certain to continue its recognition as a premier manufacturing company.

Tyco Electronics wishes you a safe, pleasant, and prosperous association with the company.

Welcome!

## A Message Concerning This Handbook

This handbook explains some of Tyco Electronics Corporation's philosophies and standards, and generally describes Tyco Electronics' employment guidelines. This handbook is not intended to create any contractual obligation on the part of Tyco Electronics or its employees, but is

CONFIDENTIAL
April 2002

meant to serve as a reference for employment with the company.

Because Tyco Electronics is a changing organization, the company reserves full discretion to add, modify, or delete provisions of this handbook, or the policies, procedures, or standards on which they may be based. For this reason, Tyco Electronics urges employees to check with their supervisors or Human Resources representatives to obtain current information regarding the status of any particular policy, procedure, or practice, whether or not they are referred to in this handbook. This handbook supersedes and replaces all previous Tyco Electronics employee handbooks.

No one other than the President of Tyco Electronics has the authority to enter into any employment agreement or other agreement with any Tyco Electronics employee that modifies the policies or procedures in this handbook. Any exception to the guidelines contained in this handbook, or any agreement that is inconsistent with this handbook, company policies, procedures, or standards, applies only if the modification or agreement is in writing and signed by the President.

**THE HANDBOOK IS NOT A CONTRACT, NOR SHOULD ANY PART BE INTERPRETED TO IMPLY ANY CONTRACT.** Employment with Tyco

Electronics is not for a definite term. Tyco Electronics or the employee can terminate employment at any time, for any reason or for no reason.

If there are any questions regarding this disclaimer or the contents of this handbook, please discuss them with your supervisor.

## Human Resources Intranet Web Site

Human Resources is pleased to be able to offer a valuable business tool to employees who have access to the Tyco Electronics intranet. This Web site serves as a complement to other Human Resources information sources, such as this handbook and your Human Resources representative. Some of the features included on the Web site are:

- Contact information concerning a number of Human Resources-related topics

- Links to various business units' Web sites

- Links to Internet home pages for several benefit plan vendors

- Links to important Human Resources forms

Visit the Human Resources Web site at:

http://us038wb01.amp.com/web9731nt/ushr.htm

CONFIDENTIAL

DEF00012

## Commitment to Quality

The cultural climate at Tyco Electronics is based on the values of total quality, integrity, and commitment. The company is committed to continual improvement of our ability to anticipate and satisfy our customers' needs. To serve our customers more effectively, Tyco Electronics requires that our employees be dedicated to a policy of continual improvement in all aspects of our business.

## Commitment to Diversity

Tyco Electronics is a worldwide company dedicated to valuing differences and fostering a diverse workforce. Being fully inclusive and leveraging individual strengths improves the quality of the company's decisions.

## Tyco Electronics in the Community

Tyco Electronics believes that people who volunteer in the community benefit from it, and that the company and the community benefit from such effort and commitment as well. Therefore, our employees are encouraged to participate in civic and charitable activities consistent with the needs of the business.

## 2.   Policy Statements

### Equal Employment Opportunity and Affirmative Action Policy

Tyco Electronics promotes equal employment opportunity for all employees and applicants in all aspects of employment. It is our belief that strength comes from a diverse workforce.

The company is committed to being an Equal Opportunity Employer. The objective of the company is to recruit, hire, train, and promote the most qualified applicants without regard to race, color, religion, sex, age, national origin, disability, or veteran status (disabled veteran or veteran of the Vietnam Era). All such decisions are made using standards based on the individual's qualifications as they relate to the particular job opportunity, and on the goal of furthering equal employment opportunity.

Tyco Electronics prohibits unlawful discrimination against applicants, employees, customers, or vendors based on race, color, religion, ancestry, national origin, gender, age, marital status, veteran status, sexual orientation, disability, or medical condition. Tyco Electronics also makes reasonable attempts to accommodate employees and applicants who are qualified individuals with disabilities.

### Freedom from Harassment

All Tyco Electronics employees have the right to be free from racial or ethnic slurs, unwelcome sexual advances, and other verbal or physical conduct

**CONFIDENTIAL**

that constitutes harassment. Sexual, racial, or ethnic harassment of employees will not be permitted. It is the company's goal to provide a workplace free of tensions involving matters that do not relate to company business.

In particular, an atmosphere of tension created by sex-related remarks, unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature is not condoned or tolerated. All members of management and supervisory personnel have the explicit responsibility and duty to take immediate corrective action to prevent any sexual, racial, or other harassment of our employees.

All allegations of harassment are investigated completely and promptly. Allegations that are substantiated will result in disciplinary action against the employee engaging in the harassment. Likewise, false accusations may result in disciplinary action against the complainant. Subject matter of the investigation is maintained on a "need to know" basis.

The company provides the opportunity for aggrieved employees to discuss any alleged incident of harassment with their supervisors. In the event that this is not possible or employees feel uncomfortable, they should report incidents to their Human Resources managers, or call the Tyco

International *ConcernLine* at 1-800-714-1994.

## Violence-Free Workplace

Tyco Electronics is committed to providing every employee with a work environment that is free from intimidation and threats or acts of violence. Tyco Electronics strictly prohibits employees, contractors, consultants, customers, visitors, and anyone else from engaging in any violent act or threatening behavior while on Tyco Electronics premises, or while engaged in any business-related activity with or on behalf of the company. As part of this policy, Tyco Electronics seeks to prevent workplace violence, and reserves the right to address any act or behavior that indicates a propensity toward violence.

Violence in the workplace can endanger employees' safety and security. Tyco Electronics will therefore take all appropriate steps to address violent or potentially violent behavior, including removing persons from the premises or immediately terminating employees.

The possession of weapons or dangerous devices by employees, contractors, or vendors of the company, or by visitors to the company, while representing the company or conducting company business, or at any time on the company's or our customers'

CONFIDENTIAL

April 2002

property, will be considered a violation of this policy. This policy applies to all employees, contractors, vendors, and visitors whether licensed to carry firearms or not.

Weapons and dangerous devices include, but are not limited to, any firearm; knives with blades longer than three inches; clubs, explosive or incendiary devices, hazardous or toxic chemicals or compounds, or any other item designed; intended, or used to intimidate, threaten, or cause bodily harm or injury.

Every employee is responsible for reporting promptly any instance of inappropriate, intimidating, threatening, violent, or potentially violent conduct to the employee's supervisor or another member of management, or to Human Resources or Security.

## Drug- and Alcohol-Free Workplace

Tyco Electronics is committed to maintaining a safe and healthy workplace free from the influence of alcohol or drugs. The company does not tolerate the use, consumption, sale, distribution, or possession of illegal narcotics, drugs or controlled substances, or alcohol on company property or work sites or in company-supplied vehicles, whether during working or nonworking hours. All employees must report to work in a condition to

perform their job duties safely and effectively.

The company considers drug addiction and alcoholism to be treatable diseases. Accordingly, it urges individuals with substance abuse problems to seek assistance. Further information about assistance with drug- and alcohol-related matters, which may be available from the company, can be obtained from the Human Resources Department.

## Employment Standards

For Tyco Electronics to maintain professional standards with respect to its business dealings and employment relationships, it is important that all employees understand and meet the company's expectations regarding ethical, businesslike behavior and job performance.

Tyco Electronics believes our employees and management can often solve issues through timely and frank dialogue before they become problems. In the process of performance counseling, managers will make reasonable efforts to assure that an employee understands the nature of the problem and how it might be corrected.

The company hopes that in most cases formal disciplinary action will not be required. However, if an employee fails to adhere to the

CONFIDENTIAL

April 2002

company's standards for conduct and performance, corrective action may become necessary. The type of disciplinary action taken depends on how serious the problem is.

It is not possible to list all the forms of behavior that are acceptable or unacceptable in the workplace. In addition, Tyco Electronics' policies on discrimination, harassment, violence, and alcohol and drugs in the workplace are covered elsewhere in this handbook. The following sections present some examples of personal conduct that may result in disciplinary action, up to and including immediate suspension and subsequent termination of employment.

**All employees should have a copy of the Tyco *Standards of Conduct*. If you have not received these materials, or if you have any questions whatsoever about Tyco's *Standards of Conduct* or your unit's policies and procedures, contact your supervisor, your local Human Resources representative, your unit manager, or Tyco's *ConcernLine*.**

*Conduct*
The company's reputation as a good corporate citizen is critical to its success in the marketplace. A single employee's misconduct can cause serious damage to the company. These standards are presented to

assist in guiding your conduct to protect and enhance the reputation of the company. They apply to Tyco and all of its business units.

Employees should understand that these standards are drafted broadly. In that respect, the company intends to exceed the minimum requirements of the law and industry practice. The standards identify conduct that is never acceptable and will always be considered outside the scope of your employment.

The company intends to enforce these standards vigorously. Employee conduct that might damage our reputation as a good corporate citizen will not be tolerated.

Depending on the circumstances, employees may be subject to discipline, up to and including immediate termination, for any of the following:

- Insubordination or refusal to carry out reasonable assignments

- Acts or attempted acts of dishonesty, including falsification of records, theft, or conversion of the property of the company, a customer, vendor, or another employee

- Misuse, abuse, or destruction of company property, or the property of another, on company premises or while traveling on company business

CONFIDENTIAL

DEF00016

- Violation of conflict of interest rules

- Unauthorized disclosure of confidential or proprietary information

- Interference with the work performance of another

- Acts or threats of violence toward an employee, customer, or business guest of the company, whether on or off company property

- Fighting with or harassment of another person, or involvement in other acts of gross misconduct

- Being under the influence of alcohol or illegal substances or misusing or abusing prescription drugs or medicines while on company premises or on company business

- Gambling on company premises

- Sleeping on the job

- Leaving the work area or job assignment without authorization

- Possession of a firearm, other prohibited offensive weapon (as defined by the applicable state statute), or unauthorized material (including but not limited to explosives, incendiary devices, or other hazardous items or materials) while on company premises or on company business

- Actions that indicate unfitness for the job, or that raise a potential threat to the safety or well-being of the company or its employees, customers, or property

## Environment, Health, and Safety

At Tyco Electronics, we demonstrate the highest level of concern for our employees, our customers, our communities, and the environment. As a company, Tyco Electronics operates according to the following principles:

- Tyco Electronics believes that work-related injuries and illnesses can be prevented.

- Tyco Electronics promotes the health and safety of our employees and the communities in which we operate through a continual improvement process, injury and illness prevention programs, and ongoing training and communication programs.

- Tyco Electronics protects our customers and the environment by considering health and safety in the design and manufacture of our products.

- Tyco Electronics promotes the conservation of natural resources and protection of the environment through energy and water conservation programs, emission controls, source reduction programs, and waste minimization.

### Protection of Employee Health and Safety

Tyco Electronics is committed to

CONFIDENTIAL

providing a safe and healthful working environment for all employees, contractors, and visitors. The company believes that:

- The protection of employee health and safety requires the cooperation and involvement of all employees.

- Maintaining a safe and healthful working environment is everyone's responsibility.

- Open and honest communication about health and safety hazards, concerns, and incidents is critical to our success.

- All employees are encouraged to report health and safety concerns to their supervisor, manager, or Environmental, Health and Safety representative without fear of reprisal or discrimination.

- Management is responsible and accountable for supporting and implementing an effective health and safety program.

- The protection of employee and community health and safety takes precedence over haste and shortcuts.

Tyco Electronics endeavors to provide a healthy work environment and health promotion programs for our employees. This includes ongoing monitoring of workplaces, and health promotion and fitness activities.

Some jobs require specific physical abilities or contact with special materials or substances. Applicants or employees who have been offered such positions conditionally may be requested to undergo a preemployment physical assessment, depending on the specific job requirements. These assessments are necessary to evaluate whether applicants or employees are physically capable of performing the job without hazard to themselves or others. Tyco Electronics provides periodic health screening evaluations for employees assigned to work in places that could affect physical health.

### Protection of Environmental Resources

Tyco Electronics has a obligation to our customers and communities to minimize the environmental impact of our operations. Protection of the environment and preservation of natural resources is always a consideration in manufacturing our products. The company believes that:

- The environmental impact of our operations can be minimized through continual improvement.

- Management is responsible and accountable for supporting and implementing an effective environmental program.

- Our emissions can be reduced through waste minimization and

DEF00018

source reduction programs where technically and financially feasible.

- The environmental aspects of our operation will be managed in a manner that complies with all applicable regulations, through a program for self-monitoring and continual improvement.

- The company will assist our employees, the community, and regulatory agencies in understanding the environmental impacts of our activities.

## Smoke-Free Environment

All Tyco Electronics buildings in the United States are designated non-smoking areas. Smoking is permitted in designated areas outside buildings during normal break or meal times, unless otherwise prohibited.

## 3.  Benefits

The company provides competitive benefits choices at a reasonable cost. Employees and their families receive routine preventive care, and protection from many of the catastrophic consequences of illness or accident as well. These and other benefits are tax-advantaged to provide employees with maximum savings.

## Benefits—Health and Welfare Plans

Employees are covered by the following:

- FICA (Social Security)
- State Unemployment Insurance
- Worker's Compensation Insurance
- Company-sponsored insurance and benefit plans

Company-sponsored benefits include:

- Medical and dental insurance
- Life and accidental death and dismemberment insurance
- Short- and long-term disability insurance

Employees should contact the Human Resources Department to obtain information about the specific policies covering the company's insurance programs. The company and designated plan administrators reserve the right to determine eligibility, to interpret, and to administer issues under the benefit programs. For specific information about the benefits listed above, please refer to the *Summary Plan Description* (SPD) handbook.

## Stock Purchase Plan

Employees of the company are eligible for the Employee Stock Purchase Plan. Through payroll deduction and a company contribution, employees can

CONFIDENTIAL

purchase shares of the company's common stock on the open market.

Employees can purchase shares and watch small deductions from their paychecks grow into a valuable investment. At the same time, Tyco will add to the deduction and pay all the costs involved. All of the money deducted from employee paychecks goes to purchase shares in the employee's name. Contact your Human Resources Department for more details.

### Retirement Investment and Savings Plan—401(k)

One of the most valuable benefits the company offers is the 401(k) Retirement Savings and Investment Plan. Through this plan, the company works in partnership with employees to help them ensure their future financial security. In fact, for most employees, our plan is the single most important source of retirement income.

The plan offers employees the opportunity to combine individual savings with money the company contributes on employees' behalf to build retirement savings. This voluntary tax-sheltered investment plan provides employees with a variety of investment alternatives. The amount the company contributes depends on how much the employee contributes and your years of service. Contact your

Human Resources Department for more details.

### Worker's Compensation

Employees of the company are covered by the Worker's Compensation Act while working at the company. Worker's Compensation coverage, paid for entirely by the company, provides medical expense and income protection for employees in case of injury resulting from work.

**IT IS IMPORTANT THAT ANY WORK-RELATED INJURY BE REPORTED TO YOUR SUPERVISOR IMMEDIATELY.**

### Continuation of Benefits (COBRA)

Under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the company must offer to continue medical and dental insurance coverage to all group plan participants who have lost these benefits for any reason other than discharge due to gross misconduct. The offer of coverage is extended by letter from the company's COBRA administrator at the time the benefits are lost or shortly thereafter. Coverage is continued under COBRA typically for at least 18 months from termination.

Employees and their family members may be eligible for COBRA for any of the following:

CONFIDENTIAL

DEF00020

- Termination of employment for any reason other than gross misconduct

- Ineligibility for coverage due to reduced work hours

- Divorce or legal separation of the employee and his or her spouse

- Death of the employee

- Enrollment of the employee in Medicare

Please see the *Summary Plan Description* (SPD) or contact your local Human Resources representative for more information.

## Career Development

Increased levels of employee competence benefit everyone. Tyco Electronics offers many different opportunities for professional development and skills training. Please contact your supervisor or Human Resources representative for more information.

### *Employee Education, Training, and Development*

Employees are encouraged to take advantage of career development programs and resources designed to enhance job-related skills and knowledge.

#### *Programs Provided by Tyco Electronics*

Training and development programs are provided by local businesses, and may include the following:

- Manufacturing skills

- Apprenticeships

- Engineering education

- Engineering computer skills

- Sales, marketing, and product education

- Supervisory, management, and leadership education

### *Approved Courses Through Educational Reimbursement*

The purpose of the Tyco Electronics Educational Reimbursement policy is to reimburse employees who enroll in approved Tyco Electronics-related educational courses or programs. This policy extends to all Tyco Electronics operating units in the United States. Any regular full-time employee with six months of continuous service is eligible to apply for company reimbursement for Tyco Electronics-related education in a company-approved school or professional society. Employees who participate in related education and professional certification may receive tuition reimbursement for up to 18 credits per calendar year, provided they meet the following conditions:

- The selected course of study or certification is expected to improve the employee's performance of his or her present position or prepare the employee for

CONFIDENTIAL

**April 2002**

DEF00021

advancement within the company.

- Education taken under the Tyco Electronics Educational Reimbursement program is of mutual benefit to Tyco Electronics and to the employee.

## Employee Assistance Program (EAP)

Recognizing that personal problems can affect job performance, Tyco Electronics provides confidential meetings and referrals to resources and agencies that can help employees and their families with a variety of problems, such as substance abuse, family or marital issues, and financial difficulties.

EAP can provide help with these and other problems free of charge. Think of EAP as a personal help line.

The EAP can help employees and their loved ones cope with issues such as:

- Work-related problems
- Family or relationship problems
- Critical incident stress management
- Anxiety and fear
- Grief and loss
- Parenting difficulties
- Financial and legal issues
- Substance use and abuse
- Emotional and physical abuse

- Child or elder care problems

The decision to take advantage of this service is the employee's. All conversations remain confidential between the employee and the EAP professional. However, if an EAP professional becomes concerned about safety and believes a threat of serious harm exists, the law may require that the situation be reported.

Remember, the EAP is available 24 hours a day, seven days a week. Whenever you need to talk, just pick up the phone and call your personal help line. Any communications with counselors are confidential and will not be disclosed to Tyco Electronics.

You can obtain further information about the EAP from your local Human Resources representative.

## Fitness and Recreation

Recreation and physical exercise are not only an important part of general health, but also a good way to relieve stress. To promote and encourage fitness and awareness of health among employees, the company offers a variety of wellness choices that may vary from site to site.

Additionally, many local health and fitness clubs offer reduced membership fees to Tyco Electronics employees. Contact your local Human Resources representative or view

CONFIDENTIAL

DEF00022

employee discount offerings on the Tyco Electronics Credit Union Web site for more information.

## Other Benefits

Tyco International provides other benefits as well, including special programs for computer purchases and for scholarships. Please contact your local Human Resources representative or visit the Human Resources Web site for more information.

## 4.   Record Keeping and Employee Data

### Hire Date and Service Credit Date

The employee's initial hire date is the first day of work. Generally, this is the date used in establishing benefit levels, known as the Service Credit Date.

The Service Credit Date affects many benefits such as vacation, service credit, and 401(k).

Certain changes in an employee's status may affect the Service Credit Date. If this occurs, an employee's hire date and Service Credit Date may be different.

Following are examples of situations that might affect the Service Credit Date:

- Certain leaves of absence, such as an educational leave

- Reduction in force
- Change in the number of work hours, such as full-time to part-time

Following are examples of situations that do not affect the Service Credit Date:

- Maternity or Family and Medical Leave Act (FMLA) leaves
- Military leaves
- Furloughs

Additionally, if the employee is terminated with the company and then rehired within certain federally-regulated periods, the service credit period may be retained from the previous employment period.

For answers to questions about whether or how an action affects your Service Credit Date, contact your local Human Resources representative.

### Introductory Period

Newly-hired employees of Tyco Electronics serve an introductory period of 90 calendar days. This is an opportunity for both the employee and Tyco Electronics to determine whether there is a good fit between the job, the company, and the employee's skills and interests. During this period, the employee and his or her supervisor should discuss expectations for performance and evaluate progress.

CONFIDENTIAL

Employment is not guaranteed for the entire introductory period, nor is it guaranteed at any time thereafter.

At its discretion, Tyco Electronics may extend the introductory period. Generally, there is no salary action at the end of the introductory period.

## Classification Of Employees
### *Exempt/Nonexempt*
Tyco Electronics complies with federal and state laws governing minimum wage, hours, overtime pay, and working conditions for employees. Consistently with these laws, all company positions are designated either exempt or nonexempt. These designations indicate, among other things, eligibility for overtime pay as defined by the federal Fair Labor Standards Act (FLSA) and applicable state laws.

An **exempt employee** (primarily management, professional, or administrative with major responsibility) is not covered by (in other words, is exempt from) state and federal wage and hour laws, and is therefore not entitled to receive overtime compensation.

A **nonexempt employee** is covered by state and federal wage and hour laws, and therefore entitled to receive overtime compensation.

## Verification of Employment
Typically, the company's response to written or telephone requests for employment reference information is to provide only:

- Name
- Dates of employment
- Last position held

Any request for additional information from third parties must be forwarded, in writing, to the Human Resources Department for response. Written approval from the employee may be necessary prior to releasing additional information.

Several Tyco Electronics business units provide verification of employment through the *Work Number for Everyone* or *TALX* system. The employee decides what information to release to an outside company or individual, such as a mortgage company or landlord. A brochure with instructions and more information is available. To find out if your business unit participates, contact your local Human Resources representative.

## Human Resources Records
Personnel records are considered confidential and are maintained in a secure location.

Any person who is not specifically authorized to have access to a confidential personnel file and who knowingly and willingly examines the

CONFIDENTIAL

contents or copies any of the contents shall be subject to appropriate disciplinary actions, up to and including termination.

*Keeping Employee Records Current*
It is important for both the employee and the company that employee records are kept accurate for benefits, taxes, and other purposes. It is imperative that employees report promptly any changes in personal or family status, including, but not limited to, the following:

- Name
- Address
- Telephone number
- Marital status
- Dependents
- Beneficiaries

Having up-to-date records ensures that the employee receives all information Tyco Electronics mails to the address on file, and that employees and their dependents receive the benefits coverage to which they are entitled. Tyco Electronics will assume that an employee has received any materials sent to the employee's home, even if the employee's personal information is incorrect because of failure to notify Tyco Electronics of changes. Please contact your local Human Resources representative to review your file, or for information about how to update your records.

*Access To Your Personnel File*
Tyco Electronics does not provide information from an employee's personnel file to anyone without prior written approval, except to verify employment or respond to a subpoena, court order, or other legitimate request from a governmental authority. An employee's personnel file is available only to those employees whose access has been authorized by the company on a need-to-know basis. Each employee or former employee shall be permitted to review his or her own personnel file after submitting a written request to the local Human Resources office. On receipt of such a request, Human Resources arranges for an appropriate time and location for the file to be reviewed by the requesting employee.

*Medical Records*
Tyco Electronics may be in possession of certain employee medical records as a result of required medical monitoring programs (such as annual hearing tests or pulmonary function tests), injury reports, or disability claims. These are considered confidential records and are kept in a secure location under the control of a designated employee or a contracted service provider. The only access to these medical records shall be by a designated

CONFIDENTIAL

April 2002

DEF00025

employee for a sanctioned purpose. Other Tyco Electronics employees, or the employee's supervisor, shall not have access to such medical records unless permitted or required for a specific purpose.

## Promotion, Job Assignment, and Transfer

When possible, Tyco Electronics prefers to promote from within on the basis of merit. This is possible because the company hires people who are capable of handling increased or new responsibilities, and because the company offers a wide range of opportunities for improvement and growth. Of course, internal promotion is in the company's interests as well, as it is a desirable and necessary means of attracting, retaining, motivating, and developing high-caliber personnel. Internal promotion serves to meet business needs and achieve Affirmative Action goals.

Advancement in the company is based on individual job performance, management evaluation of capability to accept more responsibility, the availability of openings, and the relative qualifications of other candidates for advancement.

Merit factors considered include, but are not limited to, performance in present and previous positions, other related experience, skills, technical qualifications, aptitude, motivation, knowledge, education, and career interests. Generally, priority is given to candidates within the same work group or department where the opening exists. Length of continuous service is considered only in the unusual event that two or more candidates are equally qualified.

## Job Posting

The company attempts to provide an efficient system for promotion and transfer opportunities. Job posting helps accomplish this objective, through our Web site and otherwise. All employees are eligible to apply for openings provided they have been in their current position 12 months and have no current pending disciplinary actions.

## Performance Management

Tyco Electronics strongly supports ongoing performance management. Employees and their supervisors are encouraged to meet regularly to discuss the business and how employees' work and work situations affect company business.

As part of the performance management process, most business units formally document performance annually and submit a performance review for inclusion in the employee's personnel file. Employees are given a chance to read, discuss, and copy any

CONFIDENTIAL

DEF00026

performance review. Additionally, employees have the option of adding a comment or statement of up to one page to any performance review before it is placed in their personnel file.

## Salary Management

Tyco Electronics strives to pay salaries that are competitive within our markets and geographic locations, and to ensure that our employees are fairly compensated for work performed. Salary management strategy may vary by business unit; however, some of the more common methods of delivering salary increases include merit increases, general increases, and promotion increases.

Merit programs at Tyco Electronics are considered "at risk," meaning that future merit increases are not an entitlement but must be earned each merit cycle. Merit increases are a reward for adding value and making contributions to the company.

While salary increases are determined by a number of factors such as overall performance of our business and the employee's salary position relative to the market and other similar jobs, individual job performance strongly influences any merit increase. Tyco Electronics processes merit increases on a common merit date.

## 5.  General Rules and Procedures

### Drugs and Alcohol

Tyco Electronics may perform preemployment, for-cause, random, or post-accident drug and alcohol testing.

The company maintains preplacement screening practices designed to prevent the hiring of individuals who use illegal drugs, or individuals whose use of legal drugs or alcohol indicates a potential for impaired or unsafe job performance. All offers of employment are conditioned on satisfactory results from the drug screen.

A prospective employee's consent to submit to such a test is a material condition of employment, and the prospective employee's refusal to consent will result in a refusal to hire.

The company prohibits the use of illegal drugs and the abuse of other controlled substances, prescription drugs or medicines, and alcohol during any time an employee is working for Tyco Electronics or while on company business. Specific examples of prohibited conduct related to drugs and alcohol include, but are not limited to, the following:

- Use, possession, manufacture, distribution, or sale of controlled substances or illegal drugs, or the distribution or sale of prescription

CONFIDENTIAL

drugs or medicines during work-
ing hours on Tyco Electronics
premises or while on Tyco
Electronics business

- Misuse or abuse of prescription
drugs or use of alcohol during
working hours on Tyco Electron-
ics premises or while on Tyco
Electronics business

- Use of alcohol or use, possession,
manufacture, distribution, or sale
of controlled substances or illegal
drugs off Tyco Electronics prem-
ises that may affect the employ-
ee's work performance, his or her
safety, the safety of others, or
Tyco Electronics' reputation in
the community or with its
customers

- Refusal to submit to or cooperate
with an investigation or search in
accordance with Tyco Electronics
policies presented in this
handbook under the headings
*Drug- and Alcohol-Free
Workplace* and *Searches*

- Conviction under any criminal
drug or alcohol statute while on
Tyco Electronics premises or
while on Tyco Electronics
business

- Failure to notify Tyco Electronics
within five days of a conviction
under a drug or alcohol statute
for a violation occurring on Tyco
Electronics premises or while on
Tyco Electronics business

### Individuals Subject to Testing
Whenever Tyco Electronics has a
reasonable suspicion that the actions,
appearances, or conduct of an
employee while on duty or reporting
for duty suggests the use of illegal
drugs, controlled substances, alcohol,
or the misuse or abuse of prescription
drugs or medicines, the employee can
be required to undergo a drug or alco-
hol test. Additional site-specific testing
programs may be implemented, con-
sistent with local law, business
requirements, and the legal require-
ments of governmental agencies.

### Medication
If an employee is being treated with
medication that is likely to impair his or
her performance, the employee must
notify his or her supervisor or Human
Resources or health services represen-
tative prior to commencing work.

### Confidentiality
Tyco Electronics respects the confi-
dentiality and privacy of all employees
and applicants. Accordingly, the
results of any test administered under
the Drug- and Alcohol-Free Workplace
policy will not be revealed by Tyco
Electronics to anyone except as
permitted or required.

### Discipline
Violation of the company's Drug- and
Alcohol-Free Workplace Policy will
result in disciplinary action at Tyco

CONFIDENTIAL

DEF00028

Electronics' discretion, up to and including immediate termination of employment.

*Treatment*

Early recognition and treatment of alcohol or drug abuse is important for successful rehabilitation, return to employment, and reduced personal, family, and social disruption. Tyco Electronics encourages the earliest possible diagnosis and treatment of alcohol or drug abuse, and supports sound treatment efforts. Employees are encouraged to use the company's EAP if they feel they may be in need of treatment. Please contact your local Human Resources representative or manager for further information or specific requirements for treatment.

## Sexual Harassment

Tyco Electronics is committed to maintaining a work environment free of unlawful discrimination including, but not limited to, sexual harassment. Tyco Electronics does not tolerate unlawful discrimination or the harassment of its applicants or employees. As part of this policy, sexual harassment is specifically prohibited.

Sexual harassment arises from unwelcome conduct, whether verbal, physical, or visual, that is based on a person's gender. Sexual harassment is unlawful and prohibited whenever it:

- Affects tangible job benefits
- Unreasonably interferes with an individual's work performance
- Creates an intimidating, hostile, or offensive working environment

Tyco Electronics will not tolerate any form of gender-based or sex-based discrimination. Such discrimination violates company policy, as well as federal and state law in the United States.

Examples of prohibited conduct from which sexual harassment may arise include, but are not limited to, discussing sexual activities, telling sexually-oriented jokes, unnecessary or unwelcome touching, commenting on physical attributes, displaying sexually-oriented or suggestive materials, making sexual advances or propositions, making sexual gestures, and using crude and offensive language.

The company provides the opportunity for any employee to discuss any alleged incident of harassment with his or her supervisor. In the event that this is not possible or the employee feels uncomfortable, he or she should report the incident to the Human Resources manager or call the Tyco International *ConcernLine* at 1-800-714-1994.

Each complaint of harassment that is reported to Tyco Electronics is

CONFIDENTIAL

investigated thoroughly and promptly. The investigation is conducted as confidentially as is reasonable under the circumstances. The person reporting the conduct is notified when the investigation is concluded. Retaliation against any person for complaining of harassment to Tyco Electronics is prohibited by Tyco Electronics, and is prohibited by state and federal law in the United States.

If it is determined that a Tyco Electronics employee has engaged in discriminatory harassment or retaliation, the employee is subject to disciplinary action up to and including termination of employment. If it is determined that an allegation of harassment has not been made in good faith, however, the complaining employee shall be subject to disciplinary action up to and including termination of employment.

If you believe that you have been harassed, or that you have observed or are aware of the sexual harassment of anyone else, you should notify your supervisor or Human Resources representative promptly. If you believe that your supervisor is engaging in harassing behavior, inform Human Resources promptly. Any Tyco Electronics employee who receives such a complaint must notify Tyco Electronics Human Resources or Tyco Electronics management immediately.

## Fitness for Duty

The company reserves the exclusive right to judge an employee as being unfit for duty and to refuse to admit or retain on its premises any employee deemed unfit.

## Searches

While involved in an investigation concerning a possible violation of a Tyco Electronics policy, standard, or rule, it may be necessary to search certain items in the workplace, including, but not limited to, an employee's desk, locker, briefcase, bag, pocketbook, clothing, vehicle, or computer, including e-mail. Tyco Electronics may also conduct periodic searches of Tyco Electronics facilities or property to identify violations or potential violations of company policies, standards, or rules. The company may make reasonable use of specially trained canines, surveillance equipment, outside agencies, or other reasonable means of investigation.

The determination to conduct a search is at the sole and exclusive discretion of Tyco Electronics management, specifically, local management, Human Resources, or company security. The company will, if practical under the circumstances, attempt to notify an employee of the search before it occurs. It is the intention of the company to perform searches in the least intrusive manner appropriate

CONFIDENTIAL

DEF00030

for the circumstances. When conducting searches or investigations, it is the intent of the company to preserve individual privacy to the extent possible and in keeping with applicable workplace privacy laws.

Refusal to cooperate with a Tyco Electronics investigation or legally permissible search may result in disciplinary action up to and including termination of employment.

## Employee Business Expenses

Employees are reimbursed for any authorized, actual, and reasonable expenses incurred in the course of conducting company business. Employees are expected to be prudent in incurring such expenses. To be eligible for reimbursement, expenses must comply with the Tyco Electronics and Internal Revenue Service (IRS) guidelines.

While most employees are seldom asked to use their personal cars for company business, if use of a personal car is necessary, employees are reimbursed at the Tyco Electronics approved rate.

Requests for reimbursement should be submitted on an expense report form or a petty cash voucher, must be submitted within 30 days of being incurred (or according to local requirements), and must be approved by the employee's supervisor or manager.

## Conflict Of Interest

The corporate image and business reputation of Tyco Electronics within the industry, the market, and the community depends on its employees. Each employee plays an important role in how the company is perceived by all of its constituencies, including customers, suppliers, and competitors.

It is therefore important that Tyco Electronics meets the highest standards of ethical conduct in business-related, personal, financial, and investment activities. Because our business reputation is a matter of perception, it is important to avoid even the appearance of impropriety or conflict of interest.

While no specific rules of conduct can be all-inclusive, Tyco Electronics offers the following guidelines to assist employees.

### *Inducements and Incentives*

The company maintains its competitive position through its intellectual property and the value and excellence of its products and services. Employees should neither offer nor accept inducements or incentives to gain or increase business from customers or potential customers. If questions arise

CONFIDENTIAL

April 2002

DEF00031



in specific competitive situations, the appropriate response should be discussed with the employee's supervisor, manager, Human Resources representative, or the Legal Department.

### Gifts and Gratuities

Tyco Electronics discourages the giving or accepting of gifts or gratuities in business dealings with customers, potential customers, vendors, and suppliers. An exception applies when such gifts are recognized as a custom of the trade, are of insignificant value, and could not reasonably be expected to cause the employee or the company to be embarrassed or obligated. If there are questions about whether a gift is appropriate, please check with your local management or Human Resources representative.

### Outside Employment

During the work day, employees are expected to devote their best efforts to the business of the company. In certain circumstances, outside employment can create a conflict of interest or physical or mental demands that could lessen an employee's performance at Tyco Electronics. Employees must disclose any conflict or potential conflict to their supervisors.

### Outside Business Interest

An employment, consulting, management, ownership, or investment relationship with a customer, vendor,

or competitor of Tyco Electronics on the part of any employee or relative of an employee, including a domestic partner, may constitute a conflict of interest. This relationship must be disclosed to the employee's supervisor and Human Resources representative, and Internal Audit must review it. This does not apply to mutual fund holdings or ownership of nominal amounts of shares in publicly traded companies. Also, employees may not accept retainers, commissions, consulting fees, or any remunerations for outside services in a related business without full disclosure to their supervisors.

### Use of Tyco Electronics Facilities for Non-Tyco Electronics Activities

All work performed during business hours and any output arising from that work, and all company facilities, equipment, labor, or supplies, are considered to be the property of Tyco Electronics. Tyco Electronics property should not be used for any outside activity without the express approval of the employee's supervisor.

If there is any question that even the appearance of a conflict may exist, this concern should be discussed with your supervisor. Most situations can be handled routinely to the satisfaction of both the company and the employee. However, failure to disclose or discuss potential conflicts of interest may lead to disciplinary

CONFIDENTIAL

DEF00032

action, up to and including termination of employment.

## Confidential Company Information

In the competitive electronics industry, one of our greatest assets is our intellectual property, which includes both the information and expertise developed by our employees. As members of the Tyco Electronics team, employees share responsibility for protecting the company's confidential information such as trade secrets, certain market information, and other technical and business know-how.

Confidential information refers not only to patents, inventions, and trade secrets, but to a wide range of Tyco Electronics materials to which all employees have access in the course of doing business. This includes, but is not limited to, records, notebooks, computer-stored data and electronic storage devices, formulas, specifications, customer lists, personnel and employment data, strategies devices, designs, systems, programs, and procedures. This information—no matter how it is reproduced, summarized, or stored—is confidential and remains the property of Tyco Electronics.

Because of the importance of protecting this type of property, all Tyco Electronics employees are required to sign a *Tyco Electronics Confidentiality and*

*Invention Assignment Agreement.* Many vendors, customers, and job applicants are also required to sign similar commitments to safeguard the company's confidential information. If there are any questions about what constitutes proprietary information or how to protect it, please contact the Legal Department.

## Solicitation

To protect employees from disturbance and to avoid interference with work, Tyco Electronics does not permit anyone from outside the company to collect funds or distribute literature on our premises without prior approval from Tyco Electronics.

Employees may not distribute promotional literature in work areas at any time except with the permission of a Human Resources representative. The company's communication systems and equipment—including bulletin boards, electronic mail, duplicating machines, and newsletters—may not be used for solicitation or sale of personal items except with the permission of a Human Resources representative. Human Resources representatives may allow exceptions for charitable purposes.

### Charitable Contributions

For sponsorship of local community activities, such as those sponsored by fire departments and local charities,

CONFIDENTIAL

please contact your local management or Human Resources representative.

## Tyco Electronics Property

Employees are expected to take reasonable care in the use, maintenance, and security of company property. Equipment, vehicles, and property are intended for official company business and with appropriate permission. All company equipment should be used on business premises unless an employee is granted prior approval from his or her supervisor to remove it. Local practices may vary. Please check with your supervisor for more information.

Upon termination of employment, all company property must be returned on or prior to the last day of work.

## Electronic Information and Communication Systems

Tyco Electronics' electronic information and communication systems are company-owned property. All messages and transmissions composed, sent, stored, or received on Tyco Electronics' electronic information and communication systems are the exclusive property of Tyco Electronics, and are not to be considered private property of any employee.

Because the electronic information and communication systems remain the property of Tyco Electronics, employees shall not have privacy rights with respect to their use of company equipment. From time to time, Tyco Electronics may access voice-mail, e-mail, computer files, telephone, fax, regular mail, or other company property for business or legal purposes. **For these reasons, Tyco Electronics employees are not to expect electronic or other forms of communication using company systems or equipment to be private.**

Tyco Electronics' electronic information and communication systems are to be used primarily for business purposes. Although from time to time it may be appropriate for employees to make personal telephone calls, or otherwise to communicate electronically for personal purposes, use of electronic information and communication systems should not be abusive, inappropriate, illegal, nor should personal use of Tyco Electronics' electronic information and communication systems interfere with the employee's work performance.

Employees using Tyco Electronics' electronic information and communication systems should be aware that e-mail and computer files can be permanent in nature, in that they may exist long after the user "deletes" the e-mail or computer file. Thus, simply

3

CONFIDENTIAL

DEF00034

deleting such information does not necessarily mean that this information is actually deleted from the system. Employees should therefore exercise the same restraint and care in creating e-mail and computer files that they would exercise in creating paper documents.

Using company systems or equipment to access inappropriate Web sites is a violation of company property. Employees should note that intranet and Internet usage is monitored.

Unauthorized or inappropriate use of Tyco Electronics' electronic information and communication systems may result in disciplinary action, up to and including immediate termination.

## Security
### Emergencies
Emergency situations such as a fire or serious physical injury should be reported following local facility guidelines. Each Tyco Electronics facility has a process in place for the reporting of emergency situations. In the unlikely event the local contact cannot be reached, "911" should be contacted.

When the appropriate responsible party is reached say, "This is an emergency," and provide the following information:

- Briefly describe the type of emergency (for example, fire, apparent heart attack, employee injured, flooding).

- Give the location of the emergency (such as the building, department or floor).

- Give your name, and the nearest telephone extension number.

The appropriate emergency service will be contacted. You may be asked to remain by the telephone or send someone to direct an ambulance or fire vehicles. During emergencies, the media or other nonemployees may try to obtain information. Refer all requests for information to the Legal Department, except those from emergency personnel.

### Identification/Access Badges
All Tyco Electronics employees are issued a company photo identification (ID) card. At many sites, the ID card may be combined with an electronic access card or electronic timekeeping card. Employees must have their ID cards with them while on company property and while traveling on company business. Local business unit managers may establish the requirement for employees to wear or display their ID cards while on company property.

Employees should exercise care in the use of the ID or access badge, and must surrender their badges to their supervisors or to Human Resources at

CONFIDENTIAL

April 2002

DEF00035

termination or other separation from the company. All company-issued ID or access badges and timekeeping cards are the property of Tyco Electronics.

### Theft Or Loss Of Personal Items

Employees are solely responsible for any personal belongings or property they bring to work. Tyco Electronics is not responsible for loss of personal property through damage or theft on or off the work site. Unfortunately, the company cannot replace personal property or reimburse employees for personal belongings that are lost or stolen from company premises, a company car, or any other location where company business is being conducted.

If you lose or find any personal property, report the incident immediately to your supervisor or to Security.

### Personal Telephone Calls

Personal telephone calls tie up company phones and the switchboard, which are needed to meet the heavy business demands of the company. Company telephones are for business use only.

Outgoing personal telephone calls should be made from public telephones during employees' scheduled breaks.

Urgent or emergency incoming messages are always delivered promptly to employees. An emergency is defined as that which may cause an employee to leave work at the time the telephone call or message is received.

### Parking

Parking is provided in designated areas for the use of our employees. Spaces designated for customers, visitors, and the handicapped are for the use of these groups only.

The company is not responsible for items lost, stolen, or damaged while vehicles are on company property. Parking on company property is available only for work purposes unless otherwise arranged.

Please obey posted speed limits in our parking lots to ensure the safety of all our employees.

### Dress Code

The company's dress code policy is in effect to present ourselves in a professional manner to our customers and vendors and to maintain a safe work environment.

1. **Manufacturing**—Includes factory floor, engineering, quality, and other personnel who spend considerable time working around or with machinery or any process equipment. Safety is the primary

CONFIDENTIAL

consideration for the manufacturing dress code. Local plant management may change this code as appropriate for safety reasons. If you have any questions, contact your supervisor or Human Resources representative.

a. Loose clothing, ties, and dangling jewelry are not to be worn when working around machinery.

b. Employees with hair longer than collar length, working on or near machinery, will need to pin up or tie back their hair.

c. Bare feet, sandals, lightweight moccasins, and open-toe shoes are not permitted in any manufacturing area.

d. Safety eyewear and hearing protection must be worn in designated areas.

e. In certain areas, employees may be required to wear uniforms. Local management or the local Human Resources representative should be contacted for any specific dress code.

2. **Administration**—Includes the reception area, sales, purchasing, accounting, and personnel who perform primarily administrative duties. Appropriate business attire is required.

## Recycling

Tyco Electronics supports a green environment and encourages employees to participate in the recycling program at their facility. Any questions or concerns should be brought to the attention of your supervisor or Human Resources representative.

## Plant Closings: Inclement Weather, Emergency Situations, and Unscheduled Shutdowns and Delays

An attempt will be made to announce plant or building closings a minimum of one hour before the start of any affected shift. The method of announcement may vary by location and may include local radio and TV stations, emergency contact lines, or voice mail. If you have questions, contact your supervisor or Human Resources representative.

## Communication

Tyco Electronics believes that the most effective way of improving performance for both the company and the individual employee is through open channels of communication at all levels of the organization.

### Open-Door Policy

Tyco Electronics' "open door" policy is based on our respect for the individual and our belief that every person should have an opportunity to discuss any matter with someone other than

CONFIDENTIAL

April 2002

DEF00037

his or her immediate supervisor. This offers every individual the opportunity to discuss ideas or problems with an appropriate person in the company. Tyco Electronics encourages employees to talk with their supervisors, and with their Human Resources representatives or any other appropriate member of management.

*Bulletins Boards*
Announcements are posted on the bulletin boards in work areas. Employees are encouraged to make it a regular habit to check these bulletin boards. If the information posted is not clear, employees should check with their supervisors or Human Resources representatives.

*Intranet*
Employees are encouraged to visit the Tyco Electronics *IntraComm* and the Tyco International *Tyconet* Web sites regularly. These sites are updated frequently with current events and changing information. Communication is a two-way street. The company provides multiple sites for communication with employees. It is the employee's responsibility to review these sites proactively for current and changing information.

## Disciplinary Guidelines
The company follows traditional notions of progressive discipline whenever possible. However,

management reserves the right to discipline or terminate employees without resorting to prior disciplinary measures.

The goal of the company's disciplinary process is to help the employee achieve an acceptable standard of conduct and performance, and thus continued productive employment. Generally, there should be a close correlation between the level of disciplinary action and the severity of the situation. Improper conduct or substandard performance should be dealt with through counseling, progress reviews, coaching, and documentation, so that discharge can be avoided when possible.

Some of the actions on the part of any employee that are subject to discipline are the following:

- Failure to meet job performance standards and expectations
- Violation of rules or employee conduct in the workplace

Disciplinary actions may include, but are not limited to:

- Counseling
- Documented counseling
- Documented warning
- Suspension
- Termination

CONFIDENTIAL

DEF00038

These guidelines are provided to show possible courses of disciplinary action. Employees are reminded that the disciplinary process and the actions taken depend on the severity of the situation. The company reserves the right to terminate an employee immediately if the situation warrants. Employees should consult with their supervisors about local guidelines.

## Complaint Resolution

The company strives to establish policies, guidelines, and day-to-day practices to ensure mutual trust and respect. Clear and open channels of communication in both directions between employees and supervisors are paramount in maintaining positive employee relations.

The company's complaint resolution procedure allows employees to air their complaints and seek relief when matters cannot be resolved on a normal, informal basis with their supervisors. The goal of this process is not to eliminate complaints but to provide all employees with a way to voice questions or concerns about their jobs or work situations, and to know they will receive a timely response. It also assists management by identifying problems with employee relations before they become serious. The company strives to analyze complaints in the manner described below; however, it is not

under any obligation to do so. The following are suggestions only and may be modified or disregarded at any time, with or without notice.

**Phase I**—This is the first and most direct way for issues to be raised about the job or work situation. An employee contacts his or her supervisor to talk over problems or questions. The supervisor is to listen and give honest answers. If the supervisor disagrees with the employee and cannot correct the situation, or the supervisor is unwilling to change an earlier decision, then Phase II offers another step.

**Phase II**—At the employee's request, the supervisor arranges interviews with additional levels of management, including the department manager and Human Resources representative. The employee is invited to present problems and concerns, and every effort is made to resolve the issue. An employee may be dissatisfied with the course of action taken or feel the matter is too delicate to go through a supervisor in the first place, as in the case of alleged sexual harassment, for example. Phase II provides another audience—someone not directly involved in the situation. It is important to note that this Phase is normally not a replacement for Phase I.

To initiate Phase II, an employee sends a written request for review by the

CONFIDENTIAL

April 2002

DEF00039

department manager, who investigates and sends a prompt response to the employee.

**Phase III**—This is the final step if the employee is not completely satisfied with the decision. This phase provides direct access to the Tyco *ConcernLine*. If after Phases I and II the employee is not satisfied with the outcome of the situation, he or she may transmit to corporate headquarters written notice giving a full and clear description of the issue and its disposition. The situation is then reviewed promptly, and the employee is informed of the final resolution of the matter.

This is the recommended process for any employee complaint. However, the company recognizes that there are times when an employee must circumvent one or more phases of the process. During those times, employees are welcome to contact the manager of the Human Resources Department or the Unit Manager, or make use of the Tyco *ConcernLine* at 1-800-714-1994.

### Reduction in Force and Facility Closures

In the event that the company must close a facility, reduce the size of its workforce, or implement reduced work hours due to divestiture of a business, reorganization, business or economic conditions, or some unforeseen

event, it will comply with all applicable federal, state, and local laws.

The company endeavors to provide timely notice to all employees affected by these actions as soon as it practically can.

In the event of a facility closing or reduction in force, employees may be notified of:

- Opportunities for transfer to another facility
- Eligibility requirements for such transfers
- Continuation of benefits
- Opportunities for retraining
- Other information available to help employees in transition

#### Severance
Tyco Electronics typically provides a severance package to employees affected by a reduction in force. This package is designed to assist employees in transition to new employment, and includes outplacement assistance. Should you be affected by a reduction in force, your supervisor or Human Resources representative will provide complete information.

#### Resignation
The company requests that employees who plan to leave their employment give written notice at least two weeks in advance of the expected

CONFIDENTIAL

termination date. Such notice facilitates the orderly transfer of work assignments.

Failure to return to work upon the expiration of a personal leave of absence, jury duty, military leave, or any other approved leave without explanation or excuse approved by the company is treated as a voluntary termination of employment as of the first day of the unapproved absence.

Company property must be returned on or before the last day of work. This includes, but is not limited to, security and access cards, computer hardware and software, vehicles, vendor and customer information, tools and equipment, and office equipment including company telephones and pagers. In the event of failure to return such items, there will be an appropriate deduction from the employee's final paycheck.

Employee benefits normally end either on the date of termination or the end of the month of the termination.

## Termination of Employment

As explained previously, the employment relationship with Tyco Electronics is "at will," which means that either the employee or Tyco Electronics can terminate the employment relationship at any time, with or without advance notice, and with or without cause.

Upon termination, employees receive a final paycheck for all time actually worked (less the amount of any outstanding advances or loans), and for accrued and unused vacation hours on record as of the termination date. No payment is made for any unused Personal Time (PT), except as required by law, nor is any there any payment for unused holiday time. Benefits coverage ceases in accordance with the provisions of the applicable plan.

## Exit Interviews

Before an employee's last day of work, the Human Resources Department may conduct a confidential exit interview. During this meeting, the employee has an opportunity to share any comments regarding his or her job, the department, or the company. The company provides information about disposition of employee benefits to the employee.

## 6.   Pay, Work Time, Vacation

## Compensation

Base pay is just one part of the employee's overall compensation from Tyco Electronics. Total compensation at Tyco Electronics can also include performance-based plans and a comprehensive package of

CONFIDENTIAL

April 2002

employee benefits. This handbook covers only a few elements of these plans.

### Payday

Tyco Electronics issues paychecks according to a regular schedule. Please inquire about local practices for information about your payday schedule. Generally, when a regular payday falls on a Tyco Electronics holiday, payday is the preceding normal workday.

### Paychecks

Tyco Electronics strongly encourages employees to apply for Direct Deposit of their pay into a financial institution of their choice. Direct Deposit ensures that the employee's paycheck is available for use immediately on payday and helps the company control the costs of pay processing.

Federal and state laws require certain deductions from the employee's paycheck before it is received. These include federal and state income taxes and Social Security (FICA) taxes, and may, in some states, include other deductions.

At the direction of the employee, there may be additional deductions from the paycheck, such as the employee's share of the cost for certain Tyco Electronics benefits and any contributions to the Tyco Employee Stock Purchase Plan and the 401(k) plan.

## Hours Of Work and Work Schedules

Tyco Electronics has the right to establish and change work hours.

Actual working hours vary throughout the company and reflect the business functions of a particular area. Generally, however, a work week consists of 40 hours in each period of seven calendar days. A work shift generally comprises eight hours in each of five scheduled workdays. Since the nature of Tyco Electronics businesses is diverse, some employees may be assigned to work week schedules with shifts and days that are subject to variable hours, with rotation of scheduled starting times, stopping times, days off, or mandatory overtime. Your supervisor advises you regarding your initial work schedule and any subsequent changes.

The definition of full-time and part-time eligibility varies by business unit. The Tyco benefits *Summary Plan Description* (SPD) handbook gives specific examples of how work time affects benefits. Contact your supervisor or Human Resources representative if you have questions about your eligibility for benefits or related matters.

### Overtime

Because the nature of our operations makes it necessary for us to be flexible and responsive to rapidly changing

CONFIDENTIAL

circumstances, working overtime may be necessary. As a result, the ability to accept and work overtime is a condition of employment. Prior authorization by a supervisor is required for employees to work overtime.

Overtime shall be paid in accordance with federal and state law. All overtime hours to be paid must be recorded as required by local practice in your business unit. If you have questions, contact your supervisor.

### Premium Pay

#### Overtime

Tyco Electronics meets the minimum federal standards for overtime pay, which require time and one-half pay for work exceeding 40 hours in one work week. Tyco Electronics also meets all applicable state and local overtime standards. In some locations, pay for overtime may exceed minimum standards. Please consult with your supervisor or local Human Resources representative if you have any questions concerning overtime.

#### Other Premium Pays

Depending on the employee's location and business unit, he or she may be eligible for other types of premium pay such as premiums for shift, weekend, or alternative work week. Please consult your supervisor or Human Resources representative for local practices concerning premium pay.

### Rest and Meal Periods

Tyco Electronics complies with all applicable federal, state, and local requirements concerning rest and meal periods. For eligible employees, rest breaks and meal periods are scheduled during each work shift, with supervisors coordinating breaks with work flow. Please see your supervisor for more information.

### Attendance and Absence

Attendance at Tyco Electronics is a condition of employment. Our employees' work is vital to the operation of the company.

As a condition of employment, employees are expected to conform to all of the following guidelines:

- Report to your workstation and be ready to work at the start of your scheduled shift, and complete each shift for which you are scheduled.

- Observe the time limits for rest and meal periods, and do not leave work early without your supervisor's prior approval.

- Notify your supervisor within one hour before a scheduled starting time of expected tardiness or absence.

- Do not be absent without notifying your supervisor.

- For an absence in excess of five consecutive days, you must

CONFIDENTIAL
April 2002

DEF00043

supply a doctor's note in order to be placed on a Leave of Absence.

Employees may be disciplined, up to and including termination, for tardiness or poor attendance.

*Time Records/Cards*
Employees are responsible for the accuracy of their time records or time cards. Employees are required to provide and submit their work time according to local practice within their business units. Employees may not record time for other employees or have other employees record their time; doing so may be grounds for immediate termination.

## Three Days No Show or No Call
If an employee is absent from work for three consecutive scheduled workdays without prior approval, he or she is regarded as having voluntarily resigned from Tyco Electronics, and the employment relationship is terminated.

## Assignment of Wages and Wage Garnishment
State or federal authorities may have cause for a legal summons to be served at an employee's work location to garnish the employee's salary to satisfy payment of taxes, delinquencies from other creditors, or child support obligations. The company shall make the appropriate deductions and

arrange for payment to the garnishing agency, including applicable fees, until the garnishment is satisfied.

Disciplinary action may be taken, by law, after three wage attachments in any one year.

## Leaves Of Absence
*Family and Medical Leave*
It is Tyco Electronics' policy to provide family and medical leave in accordance with the FMLA and applicable state laws. For more information about FMLA leave at Tyco Electronics, please refer to the Tyco benefits *Summary Plan Description* (SPD) handbook.

*Bereavement Leave*
Should a death occur in the employee's immediate family, the employee is granted up to three days of paid leave to make funeral arrangements or attend funeral services. Tyco Electronics asks that you inform your supervisor as soon as you learn of your need for funeral leave. For more information regarding the Bereavement Leave policy in your organization, please contact your local Human Resources representative.

*Personal Leave*
Under certain circumstances, regular employees who work 30 hours a week or more and who have completed at least one year of service with

CONFIDENTIAL

DEF00044

Tyco Electronics may be granted unpaid personal leaves of absence, at the supervisor's discretion.

Leaves can be requested for a variety of reasons, including education, travel, child-care, and so on. Generally, a personal leave of absence should not exceed three months. Although an employee has no guarantee of employment upon returning to work, the company will attempt to place him or her in the same job or a similar job at the end of the period of leave.

All vacation and personal time must be used prior to personal leaves being granted. Personal leave does affect the employee's Service Credit Date.

If the employee chooses, medical and dental benefits can be continued during the period of leave at the COBRA rate. Certain benefits, such as tuition reimbursement, may not be available while employees are on personal leave.

Please contact your supervisor or Human Resources representative for specific instructions about how to apply for a personal leave of absence.

### Military Leave
If employees must serve in the military or receive military training, Tyco Electronics subsidizes military pay they receive from the service for military duty for a period of time. For more information, contact your supervisor.

### Jury And Witness Duty
We encourage all employees to fulfill their civic obligations. If employees are summoned for jury duty or subpoenaed as a witness, they should immediately provide a copy of the notice to their supervisor. Employees receive their regular base pay during the time they serve on jury duty, and may keep any additional pay they receive for jury or witness duty. Employees are expected to report to work at the conclusion of duty, and during any period of extended time off, postponement, or any similar delay.

Employees normally scheduled to work graveyard or swing shift are not expected to report to their normal shift if they have fulfilled a jury obligation earlier in the same day, but may be permitted to work at the supervisor's discretion.

### Voting Time
Tyco Electronics encourages all employees to exercise their right to vote. In most locations, polling places are open for voting before and after regular work hours and employees should vote during these times.

Certain states permit employees to take paid time off to vote if the polling hours of their assigned voting place make it necessary for them to vote

CONFIDENTIAL

April 2002



during their regular work hours only. Arrangements must be made with the employee's supervisor in advance. Employees may be required to submit proof of having voted.

### School Activities Time Off

Certain states permit regular employees who are parents, guardians, or grandparents with custody of a child who is in licensed daycare or in kindergarten through 12th grade to take unpaid time off to participate in school activities. Supervisors may require documentary proof of school activity participation from the school. Please see your supervisor or Human Resources representative regarding the practice at your site.

## Time-Off Benefits

Time off with pay is an important benefit for both the employee and the company. Tyco Electronics believes time off enhances the productivity and creativity of our employees.

### Vacation

Regular full-time employees are eligible for vacation, depending on length of service. Please contact your supervisor or local Human Resources representative regarding the practice at your site.

### Holidays

All Tyco Electronics employees regularly scheduled to work at least 20 hours a week are eligible for holidays with pay.

To qualify for holiday pay, employees must work the regularly scheduled workdays immediately before and after any paid holiday, unless they have prior permission from their supervisors to be absent.

Holiday schedules may vary according to work locations.

If employees wish to observe a holiday other than one of those observed by Tyco Electronics, the company will attempt to accommodate their requests and allow them to take such time off as vacation time, personal time, or as time off without pay. Please see your supervisor for this type of request.

### Personal or Sick Time

Please see your supervisor or local Human Resources representative for the particular arrangements for sick leave or personal time at your location.

DEF00046

# EXHIBIT D

DEF00001

Tyco Electronics Corp - US

ANTHONY M VILLA
2114 COUGHLIN CT
DOS PALOS CA 93620

Employee Number: 83370
Building: R16 Cost Center: 14239          Payroll Area: B3
Hourly Rate/Periodic Sal.: $        22.00
Hourly Rate/Lead Pay:                0.00
401k Deductions: Pre Tax      0 %  Post-Tax      0 %

Federal  Mar. Status  Exemptions  Additional Amt.
         Married      02
State    Single       02

Pay Period : 10/20/2008 - 10/26/2008
Pay Date:    10/31/2008

| | Cash Earn. | Taxes | Code | Net Pay |
|---|---|---|---|---|
| Current | 858.00 | 107.21 | 0.00 | 750.79 |
| YTD | 858.00 | 107.21 | 0.00 | |

## Cash Earnings

| | Current | YTD | Retro Period | Hours | Current | YTD |
|---|---|---|---|---|---|---|
| Regular Pay (Non-Ex) | 28.11 | 28.11 | | 31.50 | 825.00 | 825.00 |
| Straight Overtime | 53.20 | 53.20 | | 1.00 | 22.00 | 22.00 |
| Overtime 0.5x Prem | 12.44 | 12.44 | | 1.00 | 11.00 | 11.00 |
| | 6.60 | 6.60 | | | | |
| | 6.86 | 6.86 | | | | |

## Taxes

| Taxes | Current | YTD |
|---|---|---|
| Federal | 28.11 | 28.11 |
| Social Sec | 53.20 | 53.20 |
| Medicare | 12.44 | 12.44 |
| California | 6.60 | 6.60 |
| DI/UC | 6.86 | 6.86 |

## Taxable Earngs.

| Taxable Earngs. | Current | YTD |
|---|---|---|
| Federal | 858.00 | 858.00 |
| Social Sec | 858.00 | 858.00 |
| Medicare | 858.00 | 858.00 |
| California | 858.00 | 858.00 |
| DI/UC | 858.00 | 858.00 |

## Current Net Pay Distribution

Check              $        750.79

| | Used | Cur Bal | Pri Bal |
|---|---|---|---|
| VAC: | | 6.17 | 77.00 |
| PER: | | 8.00 | 8.00 |
| SCK: | | 3.10 | 38.80 |

D's EXHIBIT 19
Julie Alford
CSR No. 7694
Date: 6-17-10
Witness
VILLA

Tyco Electronics Corp - US

ANTHONY M UELLA
2114 COUGHLIN CT
D06 PALOS CA  93620

Employee Number: 83176
Building: B16 Cost Center: 14239     Payroll Area: 83
Hourly Rate/Periodic Sal.: $            22.00
Hourly Rate/Lead Pay:                   0.00
401k Deductions: Pre-Tax    0   % Post-Tax    0   %

Pay Period : 10/27/2008 - 11/09/2008
Pay Date:    11/14/2008

|  | Mar. Status | Exemptions | Additional Amt. |
|---|---|---|---|
| Federal | Married | 00 |  |
| State | Married | 03 |  |

| | Cash Earn. | Taxes | Deds | Net Pay |
|---|---|---|---|---|
| Current | 2,113.10 | 391.60 | 0.00 | 1,721.50 |
| YTD | 2,971.10 | 496.81 | 0.00 | |

## Cash Earnings

| | Retro Period | Hours | Current | YTD |
|---|---|---|---|---|
| Regular Pay (Non-Ex) | | 80.00 | 1,760.00 | 2,585.00 |
| Straight Overtime | | 10.70 | 235.40 | 257.40 |
| Overtime 0.5x Prem | | 10.70 | 117.70 | 128.70 |

## Taxes

| Taxes | Current | YTD | Taxable Range | Current | YTD |
|---|---|---|---|---|---|
| Federal | 180.15 | 208.44 | Federal | 2,113.10 | 2,971.10 |
| Social Sec | 131.01 | 184.21 | Social Sec | 2,113.10 | 2,971.10 |
| Medicare | 30.64 | 43.08 | Medicare | 2,113.10 | 2,971.10 |
| California | 32.71 | 39.31 | California | 2,113.10 | 2,971.10 |
| DI/UC | 16.91 | 23.77 | DI/UC | 2,113.10 | 2,971.10 |

## Current Net Pay Distribution

| Check | $ 1,721.50 |
|---|---|

| | Used | Cur Bal | Prj Bal |
|---|---|---|---|
| VAC: | 9.25 | 77.00 | |
| PER: | 8.00 | 8.00 | |
| SCK: | 4.65 | 38.80 | |

DEF00002

DEF00003

ANTHONY M VILLA
2114 COUGHLIN CT
DOS PALOS CA 93620

Tyco Electronics Corp - US

Employee Number: 83370
Building: R, Cost Center: 14239       Payroll Area: BJ
Hourly Rate/Period Sal: $             22.00
Hourly Rate/Lead Pay:                 0.00
401k Deductions: Pre-Tax    2   4 Post-Tax

Pay Period : 11/10/2008 - 11/23/2008
Pay Date:    11/28/2008

Federal Mar. Status  Married   Exemptions  Additional Amt.
State                Married         03
                                     03

| | Cash Earn. | Taxes | Deds | Net Pay |
|---|---|---|---|---|
| Current | 1,406.20 | 265.05 | 165.21 | 1,375.94 |
| YTD | 4,777.30 | 763.16 | 165.21 | |

| Cash Earnings | Hours | Current | YTD |
|---|---|---|---|
| Regular Pay (Non-Ex) | 80.00 | 1,730.00 | 4,345.00 |
| Straight Overtime | 1.40 | 30.80 | 288.20 |
| Overtime 0.5x Prem | 1.40 | 15.40 | 141.20 |

| Non-Cash Earnings | | Current | YTD |
|---|---|---|---|
| 401k Company Match | | 90.31 | 90.31 |

| Retro Period | | | |
|---|---|---|---|

| Retro Period | | | |
|---|---|---|---|

| Taxable Earnings | Current | YTD |
|---|---|---|
| Federal | 1,640.99 | 4,612.09 |
| Social Sec | 1,677.11 | 4,648.21 |
| Medicare | 1,677.11 | 4,648.21 |
| California | 1,640.99 | 4,618.09 |
| DI/UC | 1,677.11 | 4,648.21 |

| Taxes | Current | YTD |
|---|---|---|
| Federal | 105.61 | 117.95 |
| Social Sec | 103.98 | 288.19 |
| Medicare | 24.32 | 67.40 |
| California | 13.82 | 53.13 |
| DI/UC | 13.42 | 37.19 |

| Voluntary Deducts. | Current | YTD |
|---|---|---|
| Medical Pre-Tax | 129.09 | 129.09 |
| 401k Pre-Tax | 36.12 | 36.12 |

Current Net Pay Distribution
TYCO ELECTRONICS $   1,375.94

| | Used | Cur Bal | Prj Bal |
|---|---|---|---|
| VAC: | | 13.33 | 77.00 |
| PER: | | 8.00 | 8.00 |
| SCK: | | 6.20 | 38.80 |

3

DEF00004

Tyco Electronics Corp -US

ANTHONY M VILLA
2114 COUGHLIN CT
DOS PALOS CA 93620

Employee Number: 85170
Building 212 Cost Center: 14239          Payroll Area: E3
Hourly Rate/Periodic Sal.: $        22.00
Hourly Rate/Lead Pay:                0.00
401k Deduction: Pre Tax    2  % Post-Tax    0  %

Pay Period : 11/24/2008 - 12/07/2008
Pay Date:    12/12/2008

Federal   Mar. Status   Exemptions   Additional Amt.
          Married            03
State     Married

| | Cash Earn. | Taxes | Deds | Net Pay |
|---|---|---|---|---|
| Current | 1,895.30 | 289.17 | 167.00 | 1,439.13 |
| YTD | 6,072.60 | 1,053.00 | 332.21 | |

**Cash Earnings**      Retro Period

| | Hours | Current | YTD |
|---|---|---|---|
| Regular Pay (Non-Ex) | 56.00 | 1,232.00 | 5,577.00 |
| Straight Overtime | 4.10 | 90.20 | 173.40 |
| Overtime 0.5x Prem | 4.10 | 45.10 | 189.20 |
| Holiday | 16.00 | 352.00 | 352.00 |
| Sick Pay | 8.00 | 176.00 | 176.00 |

**Non-Cash Earnings**      Retro Period

| | Current | YTD |
|---|---|---|
| 401k Company Match | 94.77 | 165.08 |

**Voluntary Deducts.**

| | Current | YTD | Balance |
|---|---|---|---|
| Medical Pre-Tax | 129.09 | 258.18 | |
| 401k Pre-Tax | 37.91 | 74.03 | |

**Current Net Pay Distribution**

TYCO ELECTRONICS $   1,439.13

| | Used | Cur Bal | Prj Bal |
|---|---|---|---|
| VAC: | | 15.42 | 79.00 |
| PER: | 8.00 | 8.00 | 8.00 |
| SCK: | | 0.25- | 30.80 |

**Taxes**

| | Current | YTD |
|---|---|---|
| Federal | 122.61 | 440.56 |
| Social Sec | 109.50 | 397.59 |
| Medicare | 25.61 | 93.01 |
| California | 17.32 | 70.45 |
| DI/UC | 14.13 | 51.32 |

**Taxable Earnings**

| | Current | YTD |
|---|---|---|
| Federal | 1,728.30 | 6,340.39 |
| Social Sec | 1,766.21 | 6,414.42 |
| Medicare | 1,766.21 | 6,414.42 |
| California | 1,728.30 | 6,340.39 |
| DI/UC | 1,766.21 | 6,414.42 |

DEF00005

Tyco Electronics Corp - US

ANTHONY M VILLA
2414 COUGHLIN CT
DOS PALOS CA 93620

Employee Number: 83370
Building: R16 Cost Center: 14239   Payroll Area: B1
Hourly Rate/Periodic Sal.: $      24.00
Hourly Rate/Lead Pay:              0.00
401k Deductions: Pre-Tax   2   % Post-Tax   0   %

Federal   Mar. Status   Exemptions   Additional Amt.
State     Married       03
          Married       03

Pay Period : 12/08/2008 - 12/21/2008
Pay Date:    12/23/2008

| | Cash Earn. | Taxes | Deds | Net Pay |
|---|---|---|---|---|
| Current | 1,819.40 | 275.68 | 139.79 | 1,403.93 |
| YTD | 8,482.00 | 1,338.71 | 472.00 | |

## Cash Earnings

| | Retro Period | Hours | Current | YTD |
|---|---|---|---|---|
| Regular Pay (Non-Ex) | | 67.90 | 1,493.80 | 7,070.60 |
| Straight Overtime | | 1.80 | 39.60 | 418.00 |
| Overtime 0.5x Prem | | 1.80 | 19.80 | 209.00 |
| Holiday | | | | 352.00 |
| Personal | | 4.10 | 90.20 | 90.20 |
| Sick Pay | | 8.00 | 176.00 | 352.00 |

## Non-Cash Earnings

| | Retro Period | | Current | YTD |
|---|---|---|---|---|
| 401k Company Match | | | 90.97 | 275.65 |

## Voluntary Deducts.

| | Current | YTD | Balance |
|---|---|---|---|
| Medical Pre-Tax | 103.40 | 361.58 | |
| 401k Pre-Tax | 36.39 | 110.42 | |

## Taxable Earnings

| | Current | YTD |
|---|---|---|
| Federal | 1,679.61 | 8,020.00 |
| Social Sec | 1,716.00 | 8,130.42 |
| Medicare | 1,716.00 | 8,130.42 |
| California | 1,679.61 | 8,020.00 |
| DI/UC | 1,716.00 | 8,130.42 |

## Current Net Pay Distribution

| | | |
|---|---|---|
| Check | $ | 1,403.93 |

## Taxes

| | Current | YTD |
|---|---|---|
| Federal | 111.31 | 505.87 |
| Social Sec | 106.40 | 504.09 |
| Medicare | 24.88 | 117.89 |
| California | 15.37 | 85.82 |
| DI/UC | 13.72 | 65.04 |

DEF00006

Tyco Electronics Corp - US

ANTHONY M VILA
2114 COUGHLIN CT
DOS PALOS CA 93620

Employee Number: 63170
Building: R16 Cost Center: 14239
Hourly Rate/Periodic Sal.: $   22.00
Overtime D.5x Prem         0.00
401k Deductions: Pre-Tax  0  % Post-Tax  0  %

Payroll Area: B3

Pay Period : 12/22/2008 - 01/04/2009
Pay Date: 12/23/2008

|  | Mar. Status | Exemptions | Additional Amt. |
|---|---|---|---|
| Federal | Married | 03 | |
| State | Married | 03 | |

| | Cash Earn. | Taxes | Dedc | Net Pay |
|---|---|---|---|---|
| Current | 844.80 | 84.00 | 7.04 | 753.76 |
| YTD | 9,336.80 | 1,412.71 | 479.04 | |

## Cash Earnings

| | Retro Period | Hours | Current | YTD |
|---|---|---|---|---|
| Regular Pay (Non-Ex) | | 16.00 | 352.00 | 7,422.80 |
| Straight Overtime | | | | 418.00 |
| Overtime D.5x Prem | | | | 299.00 |
| Holiday | | | | 352.00 |
| Remaining Vacation | | 18.50 | 407.00 | 407.00 |
| Personal | | | | 90.20 |
| Remaining Personal | | 3.90 | 85.80 | 85.80 |
| Sick Pay | | | | 352.00 |

## Non-Cash Earnings

| | Retro Period | | Current | YTD |
|---|---|---|---|---|
| 401k Company Match | | | 17.60 | 293.65 |

## Taxes

| | Current | YTD |
|---|---|---|
| Federal | 12.62 | 568.49 |
| Social Sec | 12.46 | 536.14 |
| Medicare | 12.25 | 150.14 |
| California | | 85.82 |
| DI/UC | 6.76 | 71.80 |

## Taxable Earns.

| | Current | YTD |
|---|---|---|
| Federal | 837.76 | 8,857.76 |
| Social Sec | 844.80 | 8,975.22 |
| Medicare | 844.80 | 9,284.80 |
| California | 837.76 | 8,857.76 |
| DI/UC | 844.80 | 8,975.22 |

## Voluntary Deducts.

| | Current | YTD | Balance |
|---|---|---|---|
| Medical Pre-Tax | | 361.58 | |
| 401k Pre-Tax | 7.04 | 117.46 | |

## Current Net Pay Distribution

| | | |
|---|---|---|
| Check | $ | 753.76 |

DEF00007

ANTHONY N VILLA
2114 COUGHLIN CT
DOS PALOS CA 93620

Tyco Electronics Corp -US

Employee Number: 83370
Building 016 Cost Center: 14239    Payroll Area: B3
Hourly Rate/Period Sal.: $        22.00
Hourly Rate/Lead Pay:            0 % Post Tax
401k Deductions: Pre-Tax         0 % Post Tax

Pay Period : 01/05/2009 - 01/18/2009
Pay Date:    01/23/2009

| | Mar. Status | Exemptions | Additional Amt. |
|---|---|---|---|
| Federal | Married | 03 | |
| State | Married | 03 | |

| | Cash Earn. | Taxes | Deds | Net Pay |
|---|---|---|---|---|
| Current | 204.38 | 17.88 | -7.04 | 193.54 |
| YTD | 204.38 | 17.88 | -7.04 | |

**Cash Earnings**

| | Retro Period | Hours | Current | YTD |
|---|---|---|---|---|
| Regular Pay (Non-Ex)* | 12/22/2008-01/04/2009 | 16.00 | 352.00 | 352.00 |
| Sick Pay | * 12/22/2008-01/04/2009 | 6.71 | 147.62- | 147.62- |

**Non-Cash Earnings**

| | Retro Period | | Current | YTD |
|---|---|---|---|---|
| 401k Company Match | * 12/22/2008-01/04/2009 | | 17.60- | 17.60- |

**Voluntary Deducts.**

| | Current | YTD | Balance |
|---|---|---|---|
| 401k Pre-Tax | -7.04 | | -7.04 |

**Taxes**

| | Current | YTD |
|---|---|---|
| Social Sec | 12.67 | 12.67 |
| Medicare | 2.96 | 2.96 |
| DI/UC | 2.25 | 2.25 |

**Taxable Earngs.**

| | Current | YTD |
|---|---|---|
| Federal | 211.42 | 211.42 |
| Social Sec | 204.38 | 204.38 |
| Medicare | 204.38 | 204.38 |
| California | 211.42 | 211.42 |
| DI/UC | 204.38 | 204.38 |

**Current Net Pay Distribution**

| | | |
|---|---|---|
| Check | $ | 193.54 |

| | Used | Cur Bal | Prir Bal |
|---|---|---|---|
| VAC: | | 18.50 | 77.00 |
| VAC: | | 18.50 | 77.00 |
| PSB: | | 3.90 | 3.90 |
| PBR: | | 3.90 | 3.90 |
| SCK: | 8.00 | 6.70 | 22.80 |

DEF00008

ANTHONY M VILLA
2114 COUGHLIN CT
DOS PALOS CA 93620

Tyco Electronics Corp -US

Pay Period : 01/05/2009 - 01/18/2009
Pay Date: 01/23/2009

Employee Number:
Building:R16 Cost Center: 14239   Payroll Area: B3
Hourly Rate/Periodic Sal: $   22.00
Hourly Rate/Lead Pay:   0.00
401k Deductions: Pre-Tax   %  Post-Tax   0   %

Mar. Status  Exemptions  Additional Amt.

| | Cash Earn. | Taxes | Deds | Net Pay |
|---|---|---|---|---|
| Current | 204.38 | 17.88 | -7.04 | 193.54 |
| YTD | 204.38 | 17.88 | -7.04 | |

SCK:  8.00  6.70-  22.80

# EXHIBIT E

1 PETER M. HART (State Bar No. 198691)
hartpeter@msn.com
2 KIMBERLY A. WESTMORELAND (State Bar No. 237919)
kwestmoreland.loph@gmail.com
3 MELISSA COYLE (State Bar No. 232799)
mcoyle.loph@gmail.com
4 **LAW OFFICES OF PETER M. HART**
13952 Bora Bora Way, F-320
5 Marina Del Rey, California 90292
Telephone: (310) 478-5789
6 Facsimile: (509) 561-6441

7 Attorneys for Plaintiff Anthony Villa
(Additional counsel for Plaintiff on following page)
8
PATRICIA K. GILLETTE (State Bar No. 74461)
9 pgillette@orrick.com
ANDREW R. LIVINGSTON (State Bar No. 148646)
10 alivingston@orrick.com
AMIRA B. DAY (State Bar No. 239045)
11 aday@orrick.com
**ORRICK, HERRINGTON & SUTTCLIFFE LLP**
12 The Orrick Building
405 Howard Street
13 San Francisco, California 94105-2669
Telephone:   (415) 773-5700
14 Facsimile:   (415) 773-5759
Attorneys for Defendant
15 TYCO ELECTRONICS CORPORATION

16

17                 **UNITED STATES DISTRICT COURT**

18       **NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO DIVISION)**

| | |
|---|---|
| 19 ANTHONY VILLA, as an individual and on behalf of all others similarly situated, | CASE NO.:  CV 10-00516 MHP |
| 20 | *Assigned to the Honorable Marilyn Hall Patel* |
| 21          Plaintiff, | **STIPULATION AS TO FACTS** |
| 22     vs. | |
| 23 TYCO ELECTRONICS CORPORATION, a corporation; TYCO INTERNATIONAL (US) INC., a corporation; and DOES 1 through 50, | |
| 24 inclusive, | |
| 25          Defendants. | |

26

27

28
                                    1

OHS West:260990089.1

1   KENNETH H. YOON (State Bar No. 198443)
    kyoon@yoon-law.com
2   LINDA WHITEHEAD (State Bar No. 222799)
    lwhitehead@yoon-law.com
3   **LAW OFFICES OF KENNETH H. YOON**
    One Wilshire Boulevard, Suite 2200
4   Los Angeles, California 90017-3383
    Telephone: (213) 612-0988
5   Facsimile: (213) 947-1211

6   Attorneys for Plaintiff Anthony Villa

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**STIPULATION (CV 10-00516 MHP)**

OHS West:260990089.1

1                                      **STIPULATION**

2         Plaintiff Anthony Villa ("Plaintiff") and Defendant Tyco Electronics Corporation

3 ("Defendant") stipulate and agree as follows:

4         WHEREAS Plaintiff supplementally produced documents in this action on September

5 1, 2010 and agreed on September 13, 2010 to stipulate to the facts below;

6         WHEREAS the current deadline to file motions for summary judgment is September

7 17, 2010;

8         WHEREAS Defendant did not have sufficient time to serve, and Plaintiff did not have

9 sufficient time to respond to, Requests For Admissions confirming the facts stipulated to herein; and

10         WHEREAS both Plaintiff and Defendant wish to avoid any further extension of the

11 deadline to file motions in this action;

12         IT IS HEREBY STIPULATED by the parties herein, through their counsel of record,

13 as follows:

14     1.  Plaintiff and Defendant hereby stipulate to the following facts:

15         a.  Plaintiff's employment with Defendant terminated on December 23, 2008.

16         b.  The last date that Plaintiff reported to work for Defendant and the date he was informed

17             that his employment would be terminated was December 22, 2008.

18         c.  Documents bates stamped P0011-P0027 produced by Plaintiff on September 1, 2010

19             are true and correct copies of cellular telephone records requested and received by

20             Plaintiff from his cellular telephone carrier, and redacted by Plaintiff, reflecting cellular

21             telephone calls sent from and received by Plaintiff's cellular telephone between

22             October 2, 2008 and November 22, 2008.  To the best of Plaintiff's recollection, these

23             records accurately reflect calls made and received by Plaintiff on his cellular telephone

24             during this time period.

25         d.  Documents bates stamped P0028-P0033 produced by Plaintiff on September 1, 2010

26             are true and correct copies of bank records reflecting Plaintiff's deposit of certain

27             checks Plaintiff received from Defendant.

28                                 3

                                       STIPULATION (CV 10-00516 MHP)

1        e.  Plaintiff received the checks represented in documents bates stamped P0028- P0031 on

2          December 24, 2008.

3   2.  Plaintiff will provide Defendant verified responses to Requests for Admissions confirming

4     these facts within 30 days of the date of this stipulation.

5

6  DATED:      September 16, 2010          LAW OFFICES OF PETER M. HART

7

8                       By: _____

9                          Kimberly Westmoreland
                     Attorney for Plaintiff, ANTHONY VILLA

10  DATED:      September 16, 2010        ORRICK HERRINGTON & SUTCLIFFE LLP

11

12                     By: _____

13                         Andrew R. Livingston
                 Attorneys for Defendants, TYCO ELECTRONICS

14               CORPORATION and TYCO ELECTRONICS (US) INC

15

16

17

18

19

20

21

22

23

24

25

26

27

28                      4

                             STIPULATION  (CV 10-00516 MHP)

# EXHIBIT F

Amount:          $1,403.93
Account:         61000000143777
Bank Number:     03110017

Sequence Number:   1860041880
Capture Date:      12/26/2008
Check Number:      679242

Ƒ Tyco
Electronics

Tyco Electronics Corporation
Payroll Dept 161-51/12924
P.O. Box 3608
Harrisburg, PA 17105-3608

OVR/R16//14239/083370

0000679242

02-12
311

PAYMENT DATE
12/23/2008

PAY THIS AMOUNT
$ *****1,403.93*

PAY
TO THE
ORDER OF

ANTHONY M VILLA,
ONE THOUSAND FOUR HUNDRED THREE and 93/100 DOLLARS

M&T BANK
HARRISBURG, PA

PAYROLL ACCOUNT
VOID AFTER 6 MONTHS FROM DATE ISSUED
TWO SIGNATURES REQUIRED OVER $75,000.00

Thomas J Lynch

⑈"0000679242"⑈  ⑈"031100173⑈"6⑈1000000143777⑈"      ⑈"0000140393⑈"

BANK OF AMERICA,NA SFC
12100035⓪ C3682 90 21
12/26/⓪8

1860041880

Amount:        $1,403.93    REDACTED
Account:
Bank Number:   58193601

Sequence Number:   1860041879
Capture Date:      12/26/2008
Check Number:      664923314

GL
  TRAN# 3314                    SPECIAL HANDLING (Q)
  TRAN DATE: 12/26/08 03:48PM
  SCAD6492    *LOS BANOS-02      LOS    UNIT 0001569          POST DATE:12/26/08
                     $323.70 AVAIL BAL   1 NOD              $1,403.93
                     $459.00 AVG BAL     6 NSF
                    *100.00 IMMED CR      BUS:N                RUL: C02
                        CA                 0.03 CSD

                                          UGHLIN CT
                                                        CA 93620
                    REDACTED

                                          73938#131 5#0000140393#

BANK OF AMERICA,NA SFC
#121000358# C3682 54 03
12/26/06

1860041879

Amount:          $753.76
Account:         61000000143777
Bank Number:     03110017

Sequence Number:   1760797218
Capture Date:      12/29/2008
Check Number:      679244

**Ξ Tyco
Electronics**

Tyco Electronics Corporation
Payroll Dept 161-51/12924
P.O. Box 3608
Harrisburg, PA 17105-3608

OVR/R16//14239/083370          0000679244          82-17
                                                    311

| PAYMENT DATE | PAY THIS AMOUNT |
|---|---|
| 12/23/2008 | $ *******753.76* |

PAY
TO THE
ORDER OF

ANTHONY M VILLA,
SEVEN HUNDRED FIFTY-THREE and 76/100 DOLLARS

**M&T BANK
HARRISBURG, PA**

PAYROLL ACCOUNT
VOID AFTER 6 MONTHS FROM DATE ISSUED
TWO SIGNATURES REQUIRED OVER $75,000.00

⑈"000067924⑈"  ⑆:031100173⑆⑉⑈10000001437771"     ⑈"00000753761"

BANK OF AMERICA,NA SFC
▶ 121000358 E5026 99 21
                  12/29/08

1760797218

THIS IS WATERMARKED PAPER AND CONTAINS
FLUORESCENT FIBERS DO NOT ACCEPT WITHOUT
NOTING WATERMARK HOLD TO LIGHT TO
VERIFY WATERMARK DO NOT ACCEPT
IF CHECK DOES NOT HAVE BLUE BACKGROUND

DO NOT WRITE / SIGN / STAMP BELOW THIS LINE

DEPOSITORY BANK ENDORSEMENT



Amount:        $753.76   REDACTED
Account:
Bank Number:   58193601

Sequence Number:   1760797217
Capture Date:      12/29/2008
Check Number:      664923605

GL
  TRAN# 3605
  TRAN DATE: 12/27/08 02:41PM
  SCAD6492   *LOS BANOS-02      LOS    UNIT 0003562
             $1,695.83 AVAIL BAL    1 MOD
             $459.00 AVG BAL        6 NSF
             $100.00 IMMED CR       BUS:N
                 CA                 0.03 CSD

SPECIAL HANDLING (Q)

POST DATE:12/29/08
$753.76
RUL: C02

UGHLIN CT     CA 93620

73935 131  5 000007537

BANK OF AMERICA,NA SFC
12000 3564 C9205 54 13
       12/29/08

1760797217

**PROOF OF SERVICE**

**STATE OF CALIFORNIA**                    )
                                           )    **ss.**
**COUNTY OF SAN MATEO**                     )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action; my business address is 13952 Bora Bora Way, F-320, Marina Del Rey,CA 90292.

On September 1, 2010, I served the following document described as:

**PLAINTIFF'S SUPPLEMENTAL RESPONSES TO TYCO ELECTRONICS CORPORATION'S REQUEST FOR PRODUCTIONOF DOCUMENTS, SET ONE;**

on all interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as shown on the attached mailing list.

[ ]    **(BY FACSIMILE)**
I am readily familiar with the business practices of this office. The telephone number of the facsimile machine I used was (213) 489-9961. This facsimile machine complies with Rules 2003(2) of the California Rules of Court. Upon transmission, no error was reported by the facsimile machine and a printed copy of the machine's transmission record indicating that the transmission was successfully completed is attached to this declaration.

[ ]    By having copies **personally delivered to the designated party(ies)**.

[ ]    By leaving, during usual business hours, copies in the office of the party(ies) served with the person who apparently was in charge and thereafter mailing (by first class mail, postage prepaid) copies to the party(ies) served at the place where the copies were left.

[X]    **(BY MAIL)**
I am familiar with my employer's mail collection and processing practices; know that mail is collected and deposited with the United States Postal Services on the same day it is deposited in interoffice mail; and know that postage thereon is fully prepaid.

[ ]    **(BY FEDERAL EXPRESS COURIER)**
I am "readily familiar" with the firm's practice of collection and processing correspondence for Federal Express delivery. Under that practice it would be deposited·with the Federal Express Courier on that same day at Los Angeles, California in the ordinary course of business. Executed on September 1, 2010, at Los Angeles, California.

[]    (State)         I declare under penalty of perjury that the above is true and correct.

[X]    (Federal)      I declare that I am employed in the office of a member the Bar of this Court at whose direction the service was made.

Executed on September 1, 2010, at Los Angeles, California.

_____
KIMBERLY A. WESTMORELAND

1

*Anthony Villa. v. Tyco Electronics Corporation, et al.*
United States District Court, Northern District Case No. CV 10-00516 (MHP)

2

### SERVICE LIST

3

4

**Defendants Tyco Electronics Corporation, Tyco International (US), Inc.**

5

ANDREW R. LIVINGSTON

6

AMIRA B. DAY

**ORICK HERRINGTON & SUTCLIFFE**

7

405 Howard Street

8

San Francisco, California 94105-2669

Tel:  (415) 773-5700

9

Fax:  (415) 773-5759

10

11

**Attorneys for Plaintiffs (via Electronic Mail)**

12

KENNETH H. YOON

kyoon@yoon-law.com

13

**LAW OFFICES OF KENNETH H. YOON**

One Wilshire Boulevard, Suite 2200

14

Los Angeles, California 90017-3383

Telephone: (213) 612-0988

15

Facsimile: (213) 947-1211

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE